**Nos. 26-4150**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA
Plaintiff-Appellee,

v.

MICHAEL JAIME INOFUENTES,
Defendant-Appellant.

_____

Appeal from the United States District Court for the
Eastern District of Virginia
_____

**APPELLANT'S OPENING BRIEF**
_____

Brent Evan Newton
Attorney at Law
19 Treworthy Road
Gaithersburg, Maryland 20878
(202) 975-9105
brentevannewton@gmail.com

**Attorney for Appellant**
**Michael Jaime Inofuentes**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF JURISDICTION ....................................................1

STATEMENT OF THE ISSUES .........................................................1

STATEMENT OF THE CASE .............................................................2

I.  Procedural Background...............................................................2

II. Statement of the Facts ...............................................................3

    A.  Overview.............................................................................3

    B.  Pretrial Proceedings...........................................................4

        1.  Motion to Suppress Smartphone Evidence..................4

        2.  Motion to Suppress Appellant's Statements as Involuntary.........8

        3.  District Court's Rulings on the Motions to Suppress ...................15

    C.  Prosecution's Case at Trial.................................................16

    D.  Appellant's Defense at Trial................................................23

    E.  Jury Deliberations and Verdict...........................................25

SUMMARY OF THE ARGUMENT....................................................26

ARGUMENT ...................................................................................28

Issue One:  The district court erred by admitting prejudicial hearsay
evidence over Appellant's objection ................................................28

    A.  Standard of Review ...........................................................28

    B.  Government Exhibit 205A Was Inadmissible Hearsay.......................28

    C.  The Error Was Not Harmless .............................................30

Issue Two:  The district court erred by failing to instruct the jury that,
to convict Appellant, jurors had to be unanimous that Appellant committed
each charged offense on at least one specific occasion during the
multi-month period charged in the superseding indictment.............................32

    A.  Standard of Review ...........................................................32

B. The District Court Erred by Not Requiring Jury Unanimity Concerning Appellant's Alleged Offenses on Specific Occasions ......32

Issue Three:  The district court erred by denying Appellant's pretrial motion to suppress his statements to law enforcement agents as involuntary ..39

A. Standard of Review .................................................................................39

B. Ballard and Fisher's "Box-Checking" Deception Rendered Appellant's Statements Involuntary ......................................................40

C. The Involuntariness of Appellant's November 1, 2024 Statements at MIA Tainted Both the Search Warrants and Appellant's November 4, 2024 Statements at Dulles ..............................................44

Issue Four:  The district court erred by failing to suppress the evidence obtained from an unreasonable search of Appellant's smartphones in violation of the Fourth Amendment .................................................................45

A. Standard of Review .................................................................................45

B. The Government's Warrantless Search of Appellant's Smartphones Violated the Fourth Amendment Because There Was No Showing of a Nexus Between the Searches and Any Border-Protection Justification.................................................................................................46

1. Introduction.....................................................................................46

2. The Heightened Privacy Interests in Smartphones Under *Riley*...48

3. The District Court Erred by Concluding that the Government Had "Reasonable Suspicion" to Invoke the Border Exception.....50

4. The Good-Faith Exception Does Not Apply ...............................55

Issue Five:  At the very least, reversal is required because of the cumulative prejudice resulting from all the errors occurring at trial.................57

CONCLUSION ...................................................................................................58

STATEMENT CONCERNING ORAL ARGUMENT ...................................59

CERTIFICATE OF COMPLIANCE ..............................................................59

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Burgess v. United States,*
  608 A.2d 733 (D.C. 1992) ..................................................................29

*Chapman v. California,*
  386 U.S. 18 (1967) ..........................................................................44

*Commonwealth v. Conefrey,*
  650 N.E.2d 1268 (Mass. 1995) .....................................................36, 37

*Elkins v. United States,*
  364 U.S. 206 (1960) .......................................................................55, 56

*Fahy v. Connecticut,*
  375 U.S. 85 (1963) ..........................................................................57

*Herrera v. Lemaster,*
  301 F.3d 1192 (10th Cir. 2002) .........................................................31

*Kotteakos v. United States,*
  328 U.S. 750 (1946) .......................................................................30, 31

*Miller v. State,*
  16 P.3d 937 (Idaho 2000) ...............................................................35, 37

*Miranda v. Arizona,*
  384 U.S. 436 (1966) ........................................................................40

*Molina-Martinez v. United States,*
  578 U.S. 189 (2016) ........................................................................30

*Ramos v. Louisiana,*
  590 U.S. 83 (2020) ..........................................................................37

*Riley v. California,*
  573 U.S. 373 (2014) ...............................................................46, 49, 56

*Schad v. Arizona,*
  501 U.S. 624 (1991) ........................................................................38

*Securities and Exchange Commission v. Gasarch,*
  168 F.4th 11 (1st Cir. 2026) ............................................................29

*Shepard v. United States,*
  290 U.S. 96 (1933) ..........................................................................29

*State v. Clark,*
  799 S.E.2d 192 (Ga. 2017) ..............................................................43

*State v. Coleman,*
  150 P.3d 1126 (Wash. 2007) ...........................................................36

*Streetman v. Lynaugh*,
812 F.2d 950 (5th Cir. 1987)................................................................42, 43

*Sullivan v. Louisiana*,
508 U.S. 275 (1993) ..............................................................................44

*Terry v. Ohio*,
392 U.S. 1 (1968) ..................................................................................54

*United States v. Aigbekaen*,
943 F.3d 713 (4th Cir. 2019)......................................................47, 50, 51

*United States v. Alvarado-Valdez*,
521 F.3d 337 (5th Cir. 2008)................................................................31

*United States v. Anguiano*,
873 F.2d 1314 (9th Cir. 1989)..............................................................36

*United States v. Basham*,
561 F.3d 302 (4th Cir. 2009)................................................................30

*United States v. Braxton*,
112 F.3d 777 (4th Cir.1997)............................................................39, 40

*United States v. Brown*,
202 F.3d 691 (4th Cir. 2000)............................................................38, 39

*United States v. Emmert*,
829 F.2d 805 (9th Cir. 1987)................................................................29

*United States v. Foster*,
634 F.3d 243 (4th Cir. 2011)................................................................54

*United States v. Giddins*,
858 F.3d 870 (4th Cir. 2017)................................................................43

*United States v. Grubbs*,
547 U.S. 90 (2006) ................................................................................53

*United States v. Hands*,
184 F.3d 1322 (11th Cir. 1999)............................................................31

*United States v. Ickes*,
393 F.3d 501 (4th Cir. 2005)................................................................56

*United States v. Kolsuz*,
890 F.3d 133 (4th Cir. 2018)............................................................47, 48

*United States v. Lall*,
607 F.3d 1277 (11th Cir. 2010)............................................................43

*United States v. Levy*,
904 F.2d 1026 (6th Cir. 1990)..............................................................28

*United States v. Mannava*,
565 F.3d 412 (7th Cir. 2009)................................................................36

*United States v. Montoya de Hernandez*,
473 U.S. 531 (1985) ........................................................................46, 47

*United States v. Nkongho*,
  107 F.4th 373 (4th Cir. 2024) ......................................................47, 50, 51

*United States v. Pelton*,
  835 F.2d 1067 (4th Cir. 1987) ...................................................................42

*United States v. Ramsey*,
  431 U.S. 606 (1977) ...................................................................................49

*United States v. Richardson*,
  526 U.S. 813 (1999) ...................................................................................38

*United States v. Rivera*,
  412 F.3d 562 (4th Cir. 2005) ....................................................................28

*United States v. Runyon*,
  707 F.3d 475 (4th Cir. 2013) ....................................................................57

*United States v. Sanders*,
  107 F.4th 234 (4th Cir. 2024) ...................................................................32

*United States v. Santiful*,
  701 Fed. App'x 242 (4th Cir. 2017) .........................................................42

*United States v. Shears*,
  762 F.2d 397 (4th Cir. 1985) ....................................................................42

*United States v. Sprinkle*,
  106 F.3d 613 (4th Cir. 1997) ....................................................................54

*United States v. Taylor*,
  900 F.2d 779 (4th Cir. 1990) ....................................................................30

*United States v. Walton*,
  10 F.3d 1024 (3d Cir. 1993) ......................................................................43

*United States v. Williams*,
  130 F.4th 177 (4th Cir. 2025) ...................................................................45

*United States v. Ziesel*,
  38 F.4th 512 (6th Cir. 2022) .....................................................................30

*Weiler v. United States*,
  323 U.S. 606 (1945) ...................................................................................31

*Wong Sun v. United States*,
  371 U.S. 471 (1963) ...................................................................................57

## Statutes and Constitutional Provision

18 U.S.C. § 1591 ...............................................................................2, 23, 37
18 U.S.C. § 2423 ...............................................................................2, 23, 37
18 U.S.C. § 3231 ...........................................................................................1
28 U.S.C. § 1291 ...........................................................................................1
U.S. Const. amend. IV .................................................................................46

**Rules**

Fed. R. App. P. 1 .................................................................................1
Fed. R. App. P. 32(f) .........................................................................59
Fed. R. Crim. P. 51(b) .......................................................................32
Fed. R. Evid. 801(a) ..........................................................................29
Fed. R. Evid. 801(c) ..........................................................................29

**Other Authorities**

McCormack on Evidence § 246 (3d ed. 1984)......................................29

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291. On March 10, 2026, Appellant filed a timely notice of appeal of the district court's final judgment pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure. JA2313.[1] The district court had jurisdiction under 18 U.S.C. § 3231.

## STATEMENT OF THE ISSUES

1. Whether the district court erred by admitting prejudicial hearsay evidence over Appellant's objection.

2. Whether the district court erred by failing to instruct the jury that, to convict Appellant, jurors had to be unanimous that Appellant committed each charged offense on at least one specific occasion during the multi-month period charged in the superseding indictment.

3. Whether the district court erred by denying Appellant's pretrial motion to suppress his statements to law enforcement agents as involuntary.

4. Whether the district court erred by failing to suppress the evidence obtained from an unreasonable search of Appellant's smartphones in violation of the Fourth Amendment.

5. Whether reversal is required because of the cumulative prejudice resulting from all the errors occurring at trial.

---

[1] The joint appendix on appeal is abbreviated as "JA."

# STATEMENT OF THE CASE

## I.        Procedural Background

On April 24, 2025, the grand jury charged Appellant by superseding indictment with (1) recruiting, enticing, harboring, transporting, obtaining, maintaining, patronizing, and soliciting by any means a minor for the purpose of causing her to engage in a commercial sex act, in violation of 18 U.S.C. § 1591(a)(1), (b)(2), (c); and (2) having traveled in foreign commerce from the United States to Colombia, where Appellant temporarily resided, engaging, and attempting to engage, in illicit sexual conduct (i.e., a commercial sex act) with a minor, in violation of 18 U.S.C. § 2423(c), (f), (g)(2).  JA0154.

Appellant pleaded not guilty and had a jury trial that commenced on September 9, 2025.  JA0675.  A jury convicted Appellant of both charges on September 12, 2025.  JA2311.

On February 26, 2026, the district court sentenced Appellant to 220 months in federal prison followed by a 10-year term of supervised release.  The court also imposed a $200 special assessment.  JA0034.

## II. Statement of the Facts

### A. Overview

Appellant, a U.S. citizen who also was a lawful resident of Colombia, had a romantic relationship with "Individual-1,"[2] a minor female[3] there, which included consensual sex. Although it is legal under Colombian law for an adult to have a consensual sexual relationship with a person who is at least 14 years old if such sex is not prostitution,[4] Appellant was prosecuted by the Government here because it alleged that Appellant had engaged in "commercial sex" with Individual-1. Appellant was interrogated twice and his smartphones were searched[5] without a warrant (revealing texts between Appellant and the minor, photographs of the

---

[2] In the court below, Appellant's counsel referred to the alleged victim of Appellant's charged offenses as "Individual-1." The prosecution referred to the same person as "Minor Victim 1." JA0091, JA0166.

[3] Individual-1 was born on June 1, 2008 (JA2369) – meaning she was either 15 or 16 years old at all relevant times in the superseding indictment. JA0154.

[4] The age of consent for sex in Colombia is 14 (Art. 209 of the Colombian Penal Code (PNC), *see* https://www.icmec.org/wp-content/uploads/2017/10/ICMEC-Colombia-National-Legislation.pdf) except for prostitution, where the age of consent is 18 (PNC Arts. 213-219. U.S. Library of Congress, Colombia Legal Framework of Prostitution, p. 2 (2012) https://tile.loc.gov/storage-services/service/ll/llglrd/2019669597/2019669597.pdf). Therefore, for Appellant to be guilty of the two charges in the superseding indictment, the prosecution had to prove that Appellant engaged in, attempted to engage in, or solicited Individual-1 with the intent to engage in, commercial sex.

[5] Two smartphones were seized and searched from Appellant – an iPhone 14 and a Galaxy Z Fold Phone. However, at Appellant's trial, only evidence from the iPhone was offered. JA805.

minor and Appellant, and voicemail messages from her).  Appellant unsuccessfully moved to suppress both his incriminating statements and the evidence taken from his smartphones and all evidentiary "fruits" thereafter obtained.  At trial, Appellant's defense – including testifying in his own behalf – was that his sexual relationship with Individual-1 was always non-commercial, although the jury found otherwise.

**B.     Pretrial Proceedings**

**1.     Motion to Suppress Smartphone Evidence**

Appellant moved to suppress the smartphone evidence, contending that the Government had engaged in a "pretextual 'border search'" and that the Government's "'evidence collection' justification [was] too attenuated from the Government's traditional interests at the border to justify the … search."  JA0086-0087.  Appellant's motion emphasized that the warrantless searches of Appellant's smartphones did not relate to any issue of "border security" (e.g., bringing in "contraband") or "transnational" crime and, instead, were improper searches for evidence of alleged past crimes committed solely in Colombia.  JA0090.  Because the search of Appellant's smartphones was not related to those purposes, Appellant contended that the warrantless searches violated the Fourth Amendment and that all "fruits" of the searches should be suppressed.  JA0100, JA0106-0108.

At the suppression motion hearing, Special Agent Miranda Ballard of the Department of Homeland Security testified that she investigated "sex tourism" crimes in Colombia. JA0412-0416, JA0425. She first identified Appellant several months before as a possible suspect in her sex-tourism investigation because his name had come up in connection with an unrelated investigation of Stefan Correa, an identified sex-tourist defendant. JA0418-0419, JA0447.[6] Ballard then sought Appellant's travel records and learned that Appellant made frequent trips from the United States to Colombia. JA0423. Ballard admitted that, when she decided to conduct the border search of Appellant's smartphones, she was unaware that

---

[6] Ballard testified that she first identified Appellant on August 8, 2024, when his name appeared in the return of an administrative subpoena issued to Western Union in connection with the Correa investigation. JA0420. Ballard had discovered Appellant's name on records of a Western Union account of Anyi David, a Colombian woman who Ballard thought might have served as a conduit to underage sex workers in Medellin for Correa. JA0420, JA0646. Ballard thought that David herself might once have been a sex-trafficking victim, but that she had "aged out." JA0417-419. The Western Union records showed that Appellant, in October 2023 (over a year before), had sent small amounts of money (between $13 and $47) to David on five occasions when Appellant was in the United States. JA0420, JA0455-0457. Ballard speculated that the payments sent by Appellant could have been a finder's fee related to commercial sex with minors but admitted that she had no evidence of what the payments were for. JA0455. In fact, the payments turned out to be financial assistance for David's moving expenses and utilities (as Appellant proved). JA0089-0090. Ballard also admitted that during her review of the many records (including cellphone records and bank records) that she had obtained during her investigation of Correa, she had found no evidence that Appellant and Correa had any contact or ties with each other. JA0443.

Appellant was a lawfully-admitted resident of Colombia who had family there. JA0459-0461.[7]

Ballard conceded that, at the time of her search of Appellant's smartphones, she had insufficient evidence to obtain a warrant. JA481. Rather than question Appellant while he was in the United States about his activities, she waited until he had traveled to Colombia and detained him on his initial return at Miami International Airport (MIA), where she searched his smartphones and then questioned him. JA0425-0426.

Ballard directed U.S. Customs and Border Patrol (CBP) officers to conduct a "border search" of Appellant's smartphones. JA0424, JA0478-0479. Ballard claimed that she then "suspected that [Appellant] was engaging in child sex tourism and that we would find evidence of . . . that on his phone," including child pornography. JA0487.[8]

Following Ballard's directions, CBP Officer Fernanda de Oliviera told Ballard that CBP officers seized Appellant's electronic devices, including his two

---

[7] Appellant was a lawful resident of Colombia, where he had an apartment, and traveled to Medellin on a regular basis because two of his minor children lived there and also because he conducted a legal business there. JA0088, JA0112.

[8] Ballard admitted on cross-examination that she had no belief that Appellant had engaged in any illegal actions except in Colombia. She also acknowledged that she had no information that he was involved in any import/export scheme, nor that he was a threat to national security. Nor did she suspect that he was evading customs duties. JA0482-0483.

smartphones.  JA0426-0427, JA0507.  Ballard testified that, "[a]t that point we [she and two CBP officers] initiated the manual inspection of the electronics.  We went to the WhatsApp messages [on the iPhone], since that's the platform for messaging international numbers."  JA0427, JA0513.  Their initial searching lasted for around 30 minutes.  JA0432, JA0513-0514.  Ballard "did key word searches"[9] in the text messages for "minor" and "age" (using the Spanish words for those terms) – which revealed Appellant's communications with Individual-1.  JA0428.  Ballard and CBP officers continued to scroll through Appellant's iPhone during the extensive time in which Appellant was being questioned at the airport.  JA0523-0524.

The searched texts revealed discussions of Individual-1's status as a "minor," sexual topics, and the exchange of money (what Ballard surmised was for "commercial sex").  JA0429.  Ballard also found a photograph of Individual-1 lying in bed holding a teddy bear.  JA0430.

Ballard seized Appellant's smartphones and later submitted them for a more thorough "forensic" examination.  JA0766.

---

[9] Ballard claimed that she not use any "special forensic tools" for the searches but, instead, used the search function on the WhatsApp application itself.  JA0432.

### 2. Motion to Suppress Appellant's Statements as Involuntary

After searching Appellant's smartphones, Ballard and a CBP officer, Steve Vargas,[10] interrogated Appellant in a closed but not locked small interview room in the "secondary inspection area" of MIA. JA0433, JA0437, JA0533-0535. Appellant had not slept the night before the interrogation. JA0845. During the interrogation, Appellant was not handcuffed or otherwise physically restrained, and Ballard's service firearm was not visible. JA0436.

At the beginning of the interview, Ballard and Vargas did not tell Appellant that he was under a specific criminal investigation related to Individual-1 and, instead, led Appellant to believe that he was being interviewed for the purpose of "checking boxes" for a routine border-related interview of incoming passengers. JA0537-0539. Continuing with the "box-checking" theme, Vargas tried to assure Appellant that the interview was truly just a random, routine thing by telling Appellant that recently "[m]y number came up for [the same type of border] inspection, and I had to go through the whole same thing." JA0297. At the outset of the interview, Ballard advised Appellant of his *Miranda* rights, which he waived JA0280.

---

[10] The transcript of the interrogation erroneously spells "Vargas" as "Bartos." JA0579-0580.

After Appellant waived his *Miranda* rights, he learned that he had missed his connecting flight home. Ballard and Vargas told Appellant not to worry and that he would be able to get on the next flight that afternoon (and that the airline would not charge him extra). JA0280. After asking some clearly diversionary questions about whether Appellant ever had smuggled drugs and then asking questions about his reasons for traveling to Colombia and what he did on his last trip there, Ballard pivoted to asking Appellant whether he engaged in "commercial sex" in Colombia (which Appellant denied). JA0289. Ballard and Vargas then asked Appellant whether he had sex with "minors" in Colombia, which Appellant also denied. JA0291-0294.

Ballard next showed Appellant photographs of Individual-1 taken from Appellant's iPhone. JA0294-0295. Appellant denied having any romantic or sexual relationship with Individual-1, but eventually admitted that he and Individual-1 had spent the night together. JA0296. Ballard and Vargas then engaged in the following colloquy with Appellant:

> MS. BALLARD: Okay. And as far as physical affection has gone, I know this is an uncomfortable question and I hate to have to ask you, but I have to ask you, how far has that relationship gone physically with her?
>
> MR. INOFUENTES: I don't have sex with her. But I have some bad – I have probably – I don't know what I have here. I have probably sexual photos.
>
> MS. BALLARD: Mm-hmm.

MR. [VARGAS]: Mm-hmm.

MR. INOFUENTES: So this is not good for me.

MS. BALLARD: I mean, just being honest, honestly, is just, like, the most important part *so we can just check this box and say we talked about it*. … It's super uncomfortable. But we're reading [the texts] here, we just need to hammer out those details of –

MR. INOFUENTES: Got it.

MS. BALLARD: You know? So there's some things we can read, but what's important – and I know it's hard to answer these questions, but when we talk to you, when we have these types, this setting, this interview, right, that you're honest.

MR. INOFUENTES: Absolutely.

MS. BALLARD: *And as long as what you're saying, like, it matches and you're not lying – because believe it or not, it's crazy, but it's actually illegal to lie to us.*

MR. INOFUENTES: Absolutely. That's intentional, yeah.

MS. BALLARD: *Which is crazy to say, but it is illegal to lie to us. So I just – before – I see you getting nervous, I don't want you to put your foot in your mouth* –

MR. INOFUENTES: Yeah. Yeah.

MS. BALLARD: – *or get yourself in trouble for no reason*.

MR. INOFUENTES: Okay.

MS. BALLARD: *So just make sure … that you're being honest*.

MR. INOFUENTES: Absolutely.

MR. [VARGAS]: We're all adults, just say it. Just say what it is. I mean, I've been – I've come from Brazil before, and I've been in Mexi, and I work here.

MR. INOFUENTES: Absolutely, yeah. …

MS. BALLARD:  [W]e just want you to be honest, that's it.

MR. [VARGAS]: You have to be truthful.

MS. BALLARD: *And then, this is honestly our last checkbox and then we can wrap up this interview, so*.

JA0296-0297 (emphasis added).

At that point, Appellant twice admitted to having "physical and sexual" contact with Individual-1 but then contradicted himself and denied having had sex. JA0297-298, JA2375.   Ballard and Vargas then led Appellant to believe that, by telling the complete truth about his sexual conduct with Individual-1, he would not "get in trouble" (but that, by lying about it, Appellant would get in trouble).  Even after Appellant expressed a fear that he would "go to jail" based on his admissions, Ballard and Vargas told him that he would not get in trouble if he told them the truth about Individual-1:

MS. BALLARD: *Please be honest.  I'm sorry.  I just don't want you to get yourself in trouble*.

MR. [VARGAS]: *Just say it*.

MS. BALLARD: *Please be honest*.

MR. [VARGAS]: *You just have to say it. Plain English*.

MR. INOFUENTES: You're – you're really interested in – in the sexual portion of this. This is what the point is. I mean, I can tell you … this is at my house, so –

MS. BALLARD: I mean, she slept over. She slept in your bed. So –

MR. INOFUENTES: She's in the bed –

MS. BALLARD: – just – I mean, *just spit it out so we can wrap this interview up, honestly. I know you have another flight to catch. This is our last check in the box. So that's pretty much it*.

MR. INOFUENTES: Spooning. She slept in the bed with me. And it's sexual.

MS. BALLARD: Yeah.

MR. INOFUENTES: Okay?

MS. BALLARD: Okay.

MR. INOFUENTES: Yes.

MR. [VARGAS]: Both naked?

MR. INOFUENTES: No. Honestly, no. Honestly –

MR. [VARGAS]: Oh. You said it was sexual just now.

MR. INOFUENTES: Yeah, but it's not sexual, like, sex. And I'm not naked. And she's not naked. Well, anyway, I know that she was sleeping in the bed. Honestly. This is so bad.

MR. [VARGAS]: So hold on. So how did you have sex – have sexual relations or sex with her if you're not naked?

MR. INOFUENTES: Not – no, no, honestly. Honestly. I mean, naked – you mean, like, sleeping naked or having sex?

MR. [VARGAS]: Yeah, no clothes. No clothes.

MR. INOFUENTES: Naked?

MR. [VARGAS]: Naked.

MS. BALLARD: Please tell the truth.

MR. INOFUENTES: ***I'm going to go to jail now. This is horrible***. I don't know what you guys –

MR. [VARGAS]: Just – where was – did you penetrate her vagina –

MR. INOFUENTES: No, I did not.

MR. [VARGAS]: – with your penis?

MR. INOFUENTES: Honestly not.

MR. [VARGAS]: With your penis?

MR. INOFUENTES: Would you like to go – but no.

MR. [VARGAS]: With your penis, did you penetrate her anus?

MR. INOFUENTES: No. A little too silly. Okay.

MR. [VARGAS] I mean, got to get specific with you –

MR. INOFUENTES: Exactly.

MR. [VARGAS] – because you're doing this: You're going around the whole story and you're not getting to a point. ***If you just get to the point, we get this over with, and we get out of here***.

MR. INOFUENTES: Honestly, I would have – I would have -- I probably would have been happy to have sex with her. But I haven't. And I didn't. …I'm not trying to lie here. I'm sorry. …

MR. [VARGAS]: Okay. What was the furthest you went with her?

MR. INOFUENTES: But not – Okay. This is, like, a – a – a sex – sexual, like – like – like, affection.

MR. [VARGAS]: That's affection, a hug. You're demonstrating a hug. That's affectionate. After the hug, what happened?

MR. INOFUENTES: What happened? I was just – I – I – I was – I was – I'm honestly just – like you said, spooning with a girl.

MR. [VARGAS]: Okay. And you're both clothed in bed?

MR. INOFUENTES: Pajamas.

MR.[VARGAS]: Pajamas.

MR. INOFUENTES: *We're [i.e., I am] in trouble now, right?*

MS. BALLARD: *No*, it's just – I'm reading this and it's just not, like, aligning. Do you know what I mean? With what you're saying? …

MR. [VARGAS]: You're not trying to lie, but you're trying to skirt around the truth –

MR. INOFUENTES: Yes.

MR. [VARGAS]: – is what you're trying to do.

MS. BALLARD: I know it's uncomfortable, but –

MR. INOFUENTES: I – the thing is – the thing is, I – I – this is not good. This is not good. And I don't want to be – I don't want to be a criminal, and I don't want to hurt – I don't want to – I don't want to make everything hard for you guys then. …

JA0298-0300 (emphasis added).

Appellant thereafter made several incriminating statements to Ballard, Vargas, and another CBP officer who later joined the interrogation. JA0762-0765

(Gov't Exhs. 311, 312, 313, 316, 317).  At the conclusion of the interrogations at MIA – which lasted around three hours in total – Appellant was released and permitted to travel home to Virginia after a federal prosecutor in Miami declined Ballard's request to arrest Appellant at that point and file criminal charges in federal court in Miami.  JA0342, JA0439, JA0467, JA0535-0536.

Three days later, when Appellant attempted to fly back to Colombia from Dulles International Airport (Dulles) in Virginia, he was detained by two different DHS Special Agents, Samantha Fisher and Serena Liss.  JA0943-0946.  They further interrogated Appellant about the same topics discussed three days before at MIA.  JA0872-0875  (Gov't  Exhs.  403-407,  409-413).  After  that  second interrogation, Appellant was formally arrested at Dulles.   JA0949.

At  Appellant's  subsequent  jury  trial,  the  prosecution  offered  audio-recordings  of  incriminating  statements  made  by  Appellant  during  the  two interrogations.  JA0756 (Gov't Exhs. 304, 305, 308, 309, 311, 312, 313, 316, 317); JA0872-0875 (Gov't Exhs.  403-407, 409-413).

### 3.    District Court's Rulings on the Motions to Suppress

At  the  conclusion  of  the  pretrial  hearing,  the  district  court  denied  both motions to suppress.  Regarding Appellant's motion to suppress the smartphone evidence,  the  court  ruled  that  the  warrantless  "manual"  search  of  Appellant's smartphones was a valid "routine" border search that did not require a warrant or

any level of suspicion (reasonable suspicion or probable cause). The court alternatively held that the Government had at least "reasonable suspicion" that the smartphones had evidence of Appellant's unlawful commercial sex with a minor, which justified the search. JA0002-0008.

Regarding Appellant's motion to suppress his statements, the court held that the interrogating agents at MIA did not engage in improper conduct that rendered Appellant's statements involuntary. JA0014-0016. Because the district court ruled that the MIA interrogation was not improper, the court did not address Appellant's further contention that his subsequent statements at Dulles were inadmissible in view of the "taint" of the improper MIA interrogation. JA0253, JA0270.

### C. Prosecution's Case at Trial

The prosecution called three witnesses at trial – an interpreter (who testified about her translation of the texts and voice-messages on Appellant's iPhone), Ballard, and Fisher. The prosecution also admitted many of the translated text communications between Appellant and Individual-1; two translated voicemail messages of Individual-1; several photographs and a video of Individual-1 and Appellant; and also portions of Appellant's recorded statements made during the two interrogations.

Ballard testified about texts between Appellant and Individual-1 (who was then 15 years old) from March 2024 that referred to Individual-1's "work" in the

San Diego neighborhood of Medellin, which, Ballard assumed, meant that Individual-1 was a sex worker. JA0744, JA0747-0750. Ballard next testified about her interrogation of Appellant at MIA and the incriminating statements that he made there. JA0758-0764. The prosecution offered selected portions of the audio-recording of those statements. Gov't Exhs. 304, 308, 309, 312, 313, 316, 317.

Fisher testified about her interrogation of Appellant at Dulles and the incriminating statements that he made there. JA0871 *et seq.* The prosecution then offered as evidence (1) portions of Fisher's recorded interview of Appellant in which he made the incriminating statements;[11] (2) text communications between Appellant and Individual-1 (translated from Spanish to English) between February 26, 2024, and October 30, 2024;[12] (3) photographs and video-recordings found on Appellant's iPhone;[13] (4) two voice messages sent to Appellant's iPhone by Individual-1 (accompanied by Spanish transcripts and English translations of the

---

[11] Gov't Exhs. 403-407, 409-413.

[12] Gov't Exhs. 201A-204A, 209, 213, 215-221, 225-231, 233-234, 237. Appellant first met Individual-1 on February 25, 2024. JA2093.

[13] Gov't Exhs. 210-212, 214, 222-224, 235-236, 238-244.

transcripts);[14] and (5) evidence of money transfers from Appellant to Individual-1 in early March 2024.[15]

Among those items of evidence recovered from Appellant's iPhone were:

• March 4, 2024 text communications between Appellant and Individual-1 discussing his electronic transfer of money in response to her request to pay for her lodging, JA0912-0918;

• a March 7, 2024 text from Individual-1 to Appellant in which she referred to her "working" in a hotel room in Medellin, with an accompanying voice message in which she told Appellant not to "blame" her for "working" and how difficult her life was as a result of her poverty (which required her to "work"), JA0891-0893;

• March 26 and 27, 2024 text communications between Appellant and Individual-1 (1) discussing Appellant's desire for Individual-1 to "[w]ork with me"; (2) stating "I have money"; and (3) in response to Individual-1's question, "how much money will you give me, Appellant's statement, "Normal, let's go a nice place," JA0920;[16]

---

[14] Gov't Exhs. 205-206, 205A-206A.

[15] JA0909; Gov't Exhs. 208-208A.

[16] In the same text conversation, Appellant and Individual-1 continued their communications as follows:

[INDIVIDUAL-1:] I need to work. I already told you.

[APPELLANT:] Is my money no good? … [H]ere in San Diego there's a hotel.  Don't you want to work?

[INDIVIDUAL-1:] Yes, but it's only for a while. …  And tell me how much you'll give me?  Talk to me straight.

[APPELLANT:] For f*****g?

[INDIVIDUAL-1:] Yes.

[APPELLANT:] Ask.  80,000 too little?

[INDIVIDUAL-1:] Obviously that's way too little.

[APPELLANT:] Do you charge me more than some other man? You shouldn't charge so low.

[INDIVIDUAL-1:] Obviously.  You can't charge cheaper over there.

[APPELLANT:] So you go cheap with some ugly pervert?

[INDIVIDUAL-1:] I don't go cheap with anyone.

[APPELLANT:] Noooo[,] [p]lease [first name of Individual-1].

[INDIVIDUAL-1:] And you know it.

[APPELLANT:] Charge enough.  Go for 80,000.

[INDIVIDUAL-1]: I don't charge 80.

[APPELLANT:] You're worth more than gold.  How much do you charge?

[APPELLANT:] But I always give you very good money for a while. I was going to give you 200,000 for the time, but 300,000 is fine. The good one.

[INDIVIDUAL-1:] Then we'll see each other in San Diego to go to a hotel.

[APPELLANT:] Well, yes. Unless you prefer some other crazy, depraved man from around San Diego.

[INDIVIDUAL-1:] Pay for the taxi.  I'm on foot.

[APPELLANT:] I'm on the motor bike.  Around Palace.

• a voice message sent from Individual-1 to Appellant during their March 26 and 27, 2024 text communications in which she stated: "Michael, look, when we met, no, I did not charge you cheaply.  Sorry about that.  If you're expecting that because she told you told you at 80 I would go with you, no, you are very mistaken in life.  And now, now I'm off to San Diego.…" JA0922; Gov't Exhs. 205-205A.

• an April 1, 2024 text from Appellant to Individual-1 in which he stated, "Let's work you and I," sent when Individual-1 stated that she was "working" at a hotel, JA0926.

On cross-examination of Fisher, Appellant's trial counsel vigorously challenged the prosecution's English translation of a well-known location in Medellin as somehow meaning "for f*****g" in the March 26, 2024 text exchange (quoted in footnote 16, *supra*).  JA0928-0934.  Fisher admitted that, after she and Ballard learned from another agent in Miami that "el palo y el huevo" supposedly was a vulgar Spanish slang term for a sexual act, Ballard discovered that there was a park in Medellin that had the name "el palo y el huevo" – and even visited it (and texted Fisher about her discovery – causing Fisher to respond by texting "OMG").  JA930.  Fisher also admitted that, when she had interrogated Appellant at Dulles, he had said that "el palo y el huevo" was an area of Medellin (and did not refer to it as meaning a sexual act).  JA929.  Finally, Fisher also acknowledged that

[INDIVIDUAL-1:] Wait then, Michael.  I can't go to San Diego.  If you want, come to Prado.

[APPELLANT:] Asleep.

Gov't Exh. 231.

Appellant's texting "el palo y el huevo" occurred within a mere two seconds of receipt of the prior text from Individual-1 – but refused to admit that it was possible that "palo y huevo" was not intended to be responsive to Individual-1's text sent two seconds before asking "tell me how much you'll give me"  JA0933-0924.[17]  Finally, Fisher conceded that the phrase "el palo y el huevo" did not appear anywhere else in Appellant's extensive electronic communications searched by the agents.  JA0932.

On cross-examination, Fisher further admitted that the March 26 and 27, 2024 text exchanges were the only ones in which Appellant and Individual-1 ever discussed her "charging" money for sex.  JA0935.  Fisher also acknowledged that, based on her review of all the records in the Government's possession, Appellant did not send Individual-1 any money on March 26 or 27, 2024.  JA0964.  Nor did Fisher find any evidence that Appellant paid Individual-1 any money in April through November 2024.  JA0964.

On cross-examination of Fisher, Appellant's trial counsel introduced other texts between Appellant and Individual-1 in which they spoke in tender, romantic terms indicating a genuine amorous relationship, including:

---

[17] Appellant testified that he and Indivdual-1 were "speaking past each other at that point."  JA2168.

• On March 2, 2024 – three weeks before the March 26 and 27, 2024 texts quoted above – Appellant texted Individual-1 that, "I love you every much," and Individual-1 responded, "I love you, too," JA0952 (Def. Exh. 3);

• On March 4, 2024, after Appellant flew back to the United States from Colombia, Individual-1 texted him: "Have a good trip.  Text me when you arrive so I can be at ease, please.  I love you," JA0972 (Def. Exh. 14);

• On March 5, 2024, after Appellant had arrived in the United States, Individual-1 texted him: "I am going to miss you, you know. … Do you still love me or did you fall out of love with me on the plane?," JA0972 (Def. Exh. 16);

• On March 10, 2024, Individual-1 again told Appellant that, "I love you lots …," JA0959;

• On March 24, 2024, Appellant texted Individual-1 that, "My fantasy is that from tomorrow on you're my wife," JA0969 (Def. Exh. 41);

• On April 1, 2024, Appellant texted Individual-1, "I love you," and Individual-1 responded, "I love you more," JA0969 (Def. Exh. 61); and

• On October 4, 2024, Individual-1 texted Appellant that her mother "told me she wanted to meet you, because she knows you have always given me good advice," JA0976-0977 (Def. Exh. 62).

In their closing arguments, the prosecutors focused on: (1) the text communications between Appellant and Individual-1 – including texts showing that he made electronic money transfers to her, that he knew that she was an underaged sex worker, and their discussions of what she "charged" for her "work"; (2) the photographs and video-recording of Individual-1 on Appellant's smartphone, including ones taken in Appellant's apartment in Colombia; (3) Appellant's recorded incriminating statements; and (4) Individual-1's two recorded

voice-messages to Appellant, including the one in which she said that, "when we met, you know that I did not charge you cheaply."  JA2214-2234, JA2245-2249.

## D.    Appellant's Defense at Trial

Appellant's defense was that, although he had sex with Individual-1, knew that she was an underaged sex worker, and sent her money on certain occasions, he never engaged in "commercial sex" or actually intended to solicit "commercial sex" or attempted to engage in "commercial sex" with Individual-1.  Instead, Appellant contended that he was in a romantic relationship with her and all of his actual, attempted, and solicited sexual acts were intended to be non-commercial in nature.    JA2088,  JA2092-2093,  JA2126-2137,  JA2178-2192,  JA2199-2211 (Appellant's testimony), JA2233-2245 (trial counsel's closing argument).

Regarding his texts to Individual-1 in which Appellant appeared to solicit commercial sex, Appellant and his trial counsel explained that Appellant never intended to solicit, attempt, or have *commercial* sex and, instead, either was "joshing"[18] (and that Individual-1 understood his texts were not intended to be serious) or was trying to "sideline her plans" on March 26 and March 27, 2024 (and get her to come to Appellant rather than engage in prostitution) by "speaking her language" about "working" for money.    JA2088,  JA2102,  JA2126-2140,

---

[18] Gov't Exh. 140 (around 8:10 of the audio-recording).

JA2182-2183, JA2192, JA2213, JA2234, JA2242-2243.[19] Regarding Appellant's statements to Fisher about his texts on March 26 and 27, 2024, Appellant explained that he only intended to summarize what his texts appeared to say "on [their] face" in response to Fisher's questions and did not actually admit to Fisher that he intended in those texts to solicit or attempt to have commercial sex with Individual-1. JA2092-2093, JA2208-2212.

In further support of his defense, Appellant introduced several other texts between Appellant and Individual-1 that revealed a caring, romantic relationship rather than a relationship based on commercial sex. Def. Exhs. 1-62. Appellant also testified that his transfers of money to Individual-1 were not a *quid pro quo* for sex and, instead, were done simply as part of their romantic relationship. JA2086-2089.

Those additional texts included the following:

• On March 3, 2024, Appellant texted Individual-1, encouraging her to move back to her mother's home (a significant distance from Medellin) in order to be away from the lifestyle of "sex and drugs" in Medellin, JA2102-2103;

_____

[19] If Appellant subjectively never actually intended to have commercial sex with Individual-1 – even if some of his texts *appeared* to be soliciting commercial sex – he did not violate 18 U.S.C. §§ 1591(a) or 2423(c). *See* 18 U.S.C. § 1591(a) ("Whoever knowingly …solicits by any means a person …knowing …that the person has not attained the age of 18 years *and will be caused to engage in a commercial sex act*, [violates the law].") (emphasis added); 18 U.S.C. § 2423(c) (criminalizing actual "commercial sex" with a minor).

• On March 24, 2024, Appellant texted Individual-1 that, if she came back to Medellin rather than live with her mother, Individual-1 should "spend time behaving yourself, living with me." JA2110; Def. Exhs. 43, 46;

• Also on March 24, 2024, Appellant later told Individual-1 that: "You would be extremely bored. … I only want a well-behaving woman," to which Individual-1 responded, "I could be … I know it won't be easy but I can try." JA2113-2114; Def. Exh. 46, 67;

• Also, on March 24, 2024, Appellant offered to send Individual-1 money to pay for her travel back to live with her mother (instead of returning to Medellin), JA2116-2117; Def. Exh. 49;

• On March 31, 2024, Appellant texted Individual-1, encouraging her to look for legitimate employment and also discontinue her marijuana use. JA2141-2142; Def. Exh. 58.

Government Exhibit 201-A – 761 pages of text communications between Appellant and Individual-1 in February through April 2024 – contains many other examples of the genuine romantic and caring relationship between the two that belied a commercial sex relationship.

## E. Jury Deliberations and Verdict

The jury began its deliberations on the afternoon of September 11, 2025, ended for the day at 5:30 p.m., and was directed to resume deliberations at 9:30 a.m. the next day. JA2276-2277. After two and a half hours of deliberations during the next morning, the jury sent a note to the district court, asking for information about the date of Individual-1's voice-message reflected in Government Exhibit 205A. JA2286. The court instructed the jury that "your recollection of the evidence controls." JA2286-2287. Thereafter, jurors

deliberated for a little more than an hour before reaching a verdict. JA2287. The jury found Appellant guilty on both counts of the superseding indictment. JA2288.

## SUMMARY OF THE ARGUMENT

**First**, the district court erred by admitting Government Exhibit 205A – an English translation of a Spanish voice-message that Individual-1 left on Appellant's iPhone, in which she stated: "Michael, look, when we met, no, I did not charge you cheaply." Exhibit 205A was inadmissible hearsay; the Government offered that out-of-court statement, over Appellant's repeated objections, for the truth of the matter asserted to prove that Appellant's sexual relationship with Individual-1 began as a "commercial sex" relationship – an essential element of both charges. In view of the Government's repeated focus on that hearsay and the jury's obvious consideration of it, the Government cannot prove that the error was harmless.

**Second**, the district court erred by failing to instruct the jury that, for a conviction on each charge, jurors had to be unanimous that Appellant both possessed the *mens rea* (i.e., the intent to have "commercial sex" with Individual-1) and engaged in the *actus reus* (the completed sex act, an attempted sex act, or solicitation of a sex act with Individual-1) on a specific occasion over the multiple-month period alleged in the superseding indictment. The district court's failure to

do so violated Appellant's Sixth Amendment right to a unanimous verdict.  The Government cannot prove that the error was harmless.

**Third**, the district court erred by denying Appellant's motion to suppress his statements at the two airports.  The misconduct of Ballard and Vargas – including leading Appellant to believe that he would not get in trouble for admitting the truth about his sexual relationship with Individual-1 – rendered Appellant's statements involuntary.  The Government cannot prove that the error was harmless.

**Fourth**, the district court erred by denying Appellant's motion to suppress the warrantless, suspicionless search of Appellant's smartphones at MIA.  The search was unreasonable and thus violated the Fourth Amendment, and all evidentiary "fruits" of the search should be suppressed.  The Government cannot prove that the error was harmless.

**Fifth**, assuming *arguendo* that any of the foregoing errors are harmless individually, the cumulative prejudice from the multiple errors requires reversal of Appellant's convictions.

**ARGUMENT**

**ISSUE ONE: The district court erred by admitting prejudicial hearsay evidence over Appellant's objection.**

### A.    Standard of Review

Because the district court overruled Appellant's repeated hearsay objections,[20] this Court engages in *de novo* review.  *United States v. Rivera*, 412 F.3d 562, 567 (4th Cir. 2005) (reviewing "legal conclusions concerning the Rules of Evidence … *de novo*."); *United States v. Levy*, 904 F.2d 1026, 1029 (6th Cir. 1990) (whether evidence is hearsay is a legal issue reviewed in a *de novo* manner).

### B.    Government Exhibit 205A Was Inadmissible Hearsay.

Government Exhibit 205A is a Spanish transcription – with an English translation – of a voice-message sent to Appellant by Individual-1, stating:

> Michael, look, when we met, no, I did not charge you cheaply.  Sorry about that.  And if you're expecting that because she told you – told you at 80 I will go with you, no, you are very mistaken in life.  And now, now I'm off to San Diego.  Don't talk to me when you see me. I don't want to talk because I'm going to be working, don't look for me at all. …

JA0705, JA0883-884, JA0922; Gov't Exhs. 205-205A.  During trial, the prosecution repeatedly focused on this voice-message as proof of the "commercial sex" elements of the two charges – including mentioning it *four times* during closing arguments.  JA0922, JA2149, JA2221, JA2225, JA2231, JA2248.

---

[20] JA0019-0020, JA0671, JA0884.

Hearsay is a statement (1) "the declarant does not make while testifying at the current trial or hearing," and (2) "a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." FED. R. EVID. 801(a).

Individual-1's words reflected in Government Exhibit 205-A – including her assertion, "Michael, … when we met, … *I did not charge you cheaply*" – was "quintessential hearsay": an out-of-court statement of the declarant's memory used to prove "the truth of the matter asserted" at trial. *Securities and Exchange Commission v. Gasarch*, 168 F.4th 11, 29 (1st Cir. 2026). It was an "assertion"[21] about the supposed nature of a past event that the prosecution at trial offered for the "truth of the matter asserted" – namely, that Individual-1 had "charged" Appellant money for their first sexual act (in early 2024). That is, Individual-1's out-of-court statement was hearsay because it was "a statement of memory or belief to prove the fact remembered or believed." *United States v. Emmert*, 829 F.2d 805, 809-10 (9th Cir. 1987) (internal quotation marks omitted); *see also Shepard v. United States,* 290 U.S. 96, 106 (1933) ("Declarations of intention,

---

[21] *Burgess v. United States*, 608 A.2d 733, 737 n.2 (D.C. 1992) (Rogers, C.J., concurring) (noting that an out-of-court "assertion" includes a statement that "an event happened" in the past; citing MCCORMACK ON EVIDENCE § 246 (3d ed. 1984)).

casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past.  There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.").

The prosecution repeatedly referred to that Exhibit 205-A as substantive evidence – as proof that Appellant had paid Individual-1 money for sex (which was an element of both the charges).  And the jury specifically sent a note to the district court, during after three hours of deliberations, asking about Exhibit 205-A, and reached a guilty verdict thereafter – showing that jurors clearly considered the hearsay to be important in their deliberations.

### C.     The Error Was Not Harmless.

This Court must reverse Appellant's convictions unless the prosecution can prove[22] that the error was harmless – i.e., that the error did not affect Appellant's "substantial rights."  *United States v. Basham*, 561 F.3d 302, 327 (4th Cir. 2009) (citing, *inter alia*, *Kotteakos v. United States*, 328 U.S. 750 (1946)).

The *Kotteakos* standard requires reversal unless this Court is "sure" that "the error did not influence the jury, or had but very slight effect … [or that] the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 764-65; *see also United States v. Taylor*, 900 F.2d 779, 783 (4th Cir. 1990).  "The

---

[22] *Molina-Martinez v. United States*, 578 U.S. 189, 203 (2016); *United States v. Ziesel*, 38 F.4th 512, 520 n.5 (6th Cir. 2022).

question is … not were [jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. *The crucial thing is the impact of the thing done wrong on the minds of [jurors], not on [appellate judges'] own [minds], in the total setting*." *Kotteakos*, 328 U.S. at 764 (emphasis added); *see also id.* at 763-64. The *Kotteakos* standard is "demanding" on the prosecution. *Herrera v. Lemaster*, 301 F.3d 1192, 1197-98 (10th Cir. 2002) (en banc).

When conducting such harmless-error review, this Court – unlike in an assessment of the sufficiency of the evidence supporting a conviction – does not consider the testimony and evidence in a light most favorable to the prosecution. *United States v. Hands*, 184 F.3d 1322, 1330 n.23 (11th Cir. 1999), *corrected on other grounds on reh'g*, 194 F.3d 1186 (11th Cir. 1999); *see also Weiler v. United States*, 323 U.S. 606, 611 (1945).

The district court's erroneous admission of Government Exhibit 205A clearly was not harmless. We know with certainty that it was considered significant by jurors because they sent a note to the court about that very exhibit after about three hours of deliberation and returned a guilty verdict around an hour later. JA2286-2288. The prosecutors also referred to that exhibit in their closing arguments *four times*. *See United States v. Alvarado-Valdez*, 521 F.3d 337, 342 (5th Cir. 2008) (refusing to find the error harmless based on "the government's

insistent reliance on the testimony in its closing argument"). Reversal of Appellant's convictions is required.

> **ISSUE TWO: The district court erred by failing to instruct the jury that, to convict Appellant, jurors had to be unanimous that Appellant committed each charged offense on at least one specific occasion during the multi-month period charged in the superseding indictment**.

A.      **Standard of Review**

Because Appellant objected to the jury instructions, this Court engages in *de novo* review.  *United States v. Sanders*, 107 F.4th 234, 259 (4th Cir. 2024); *see also* FED. R. CRIM. P. 51(b) ("A party may preserve a claim of error by informing the court – when the court ruling or order is made or sought – of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.").

B.      **The District Court Erred by Not Requiring Jury Unanimity Concerning Appellant's Alleged Offenses on Specific Occasions.**

The district court overruled Appellant's repeated objections to the prosecution's proposed jury instructions (JA0650), on the ground that they did not require, for a conviction, jury unanimity that Appellant both possessed the *mens rea* (i.e., the intent to have "commercial sex" with Individual-1) and engaged in the *actus reus* (the completed sex act, an attempted sex act, or solicitation of a sex act

with Individual-1) *on a specific occasion* over the multiple-month period alleged in the superseding indictment. JA0022-0033, JA0657-0658, JA0669-00671.[23]

In its jury instructions, the district court did not include a specific unanimity instruction. Instead, it summarized the temporally broad charges in Counts One and Two by quoting from the superseding indictment, which alleged that Appellant committed the two charged offenses "*between* on or about February 26, 2024, and on or about November 1, 2024." JA2262-2263, JA2267 (emphasis added). The court also instructed the jury that:

> The superseding indictment charges that the offenses alleged in each of the counts were committed *between* on or about and on or about a certain date. Although it is necessary for the government to prove beyond a reasonable doubt that the offenses charged in each of the counts were committed on dates reasonably near the dates alleged in each of the counts of the superseding indictment, it is not necessary for the government to prove that the that the offenses were committed precisely on the dates charged.

JA2262 (emphasis added).

---

[23] Rather than allege multiple specific offenses on specific dates in separate counts, the superseding indictment's two broad counts alleged offensive conduct "*[b]etween* on or about February 26, 2024, through November 1, 2024" for the two counts. JA0154-0155 (emphasis added). Appellant's trial counsel acknowledged that the superseding indictment charged the offenses in that manner but contended that it was improper to include that the "between in or on about" language in the jury charge – and, instead, that the court should require jury unanimity that each charged offense occurred on at least one specific occasion. JA0668-0669, JA0815-0817.

The court's jury instructions did not require jurors to agree unanimously that Appellant's conduct satisfied the elements of each charged offense (including the *actus reus* and *mens rea* elements) *on at least one specific occasion*. The prosecution's evidence at trial sought to prove that Appellant engaged in *multiple* acts of actual, attempted or solicited commercial sex with Individual-1 over an eight-month period in 2024.[24] Conversely, Appellant vigorously contested each allegation concerning the "commercial sex" element (including testifying in his own behalf), while admitting that he had sex with Individual-1 on multiple occasions. Based on the jury instructions, some jurors may have found that Appellant committed a "commercial sex" offense on only one of the alleged dates, while others may have had a reasonable doubt that Appellant committed a "non-commercial" sex offense on that same date but found that Appellant committed a "commercial sex" offense on a different date. Because the jury instructions and verdict form did not require a finding that jurors were unanimous that Appellant had committed each of the charged offenses *on at least one specific occasion* – i.e., a unanimous finding of both the *mens rea* and the *actus reus* occurring on the same

---

[24] The prosecutors argued in their closing arguments that on "multiple" occasions Appellant solicited commercial sex from Indidivual-1 in March and April 2024, JA2227, and also argued that, at their first meeting (which appears to have occurred in February 2024), Appellant "engaged in commercial sex" with her and thereafter during his multiple monthly trips to Colombia through October 2024. JA2229-2230.

occasion (for each charge) – there is no way of knowing if the jurors were unanimous about Appellant's alleged offenses on any specific occasion. The prosecution's closing argument only increased the likelihood that jurors may have failed to reach unanimity concerning whether Appellant committed each offense on a specific occasion: "[W]hat this case is about is the defendant paying [Individual-1] for sex. *It doesn't mean he did it every time they had sex*." JA2246 (emphasis added).

Therefore, the district court erred by failing to instruct jurors that they had to be unanimous in deciding that Appellant's *actus reus* and *mens rea* for each charged offense concurred on at least one specific occasion. Other courts have held that a specific unanimity instruction is required in cases with similar facts. As the court stated in *Miller v. State*, 16 P.3d 937 (Idaho 2000), after noting that the single count of the indictment broadly charged the defendant with committing multiple sex acts against the victim "[o]n or about August, 1991, through January, 1994":

> In this case, the prosecutor could have properly charged Miller with two or more counts of the six specific instances, because each consisted of a separate incident – a distinct union of *mens rea* and *actus reus* separated by a discrete period of time and circumstance from any other such similar incident. Therefore, Miller was entitled to a jury instruction directing the jury to find him guilty, beyond a reasonable doubt, of a single agreed upon incident.

*Id.* at 942, 944.

Similarly, in *Commonwealth v. Conefrey*, 650 N.E.2d 1268 (Mass. 1995), where the defendant was charged in a single count of an indictment alleging a sexual offense against a child occurring "on diverse dates and times," *id.* at 1269, and there was evidence of eight distinct episodes of sexual contact, it was error to deny defendant's request for specific unanimity instruction. The appellate court held that:

> Because the judge did not give [a specific unanimity] instruction, we cannot know whether the jurors unanimously agreed that any particular incident occurred. ... Some jurors may have convicted the defendant on the basis of one alleged incident, while others may have convicted him based upon any of the seven other alleged incidents. … To correct any potential confusion, the judge should have augmented the general unanimity instruction to ensure that the jurors understood their duty unanimously to agree to a particular set of facts.

*Id.* at 1272. *See also United States v. Anguiano*, 873 F.2d 1314, 1319 (9th Cir. 1989) ("[W]here it appears … that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, an instruction should be given to the effect that the jury may not convict unless it unanimously agree[s] to a particular set of facts.") (citation and internal quotation marks omitted); *State v. Coleman*, 150 P.3d 1126, 1127 (Wash. 2007) ("When the prosecution presents evidence of multiple acts of like misconduct, any one of which could form the basis of a count charged, either the State must elect which of such acts is relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act."); *cf. United States v. Mannava*, 565 F.3d 412, 416 (7th Cir. 2009)

("Suppose it were uncertain whether the defendant had committed the offense on January 1 or January 2, and some jurors thought it was the first and others that it was the second. Since nothing would turn on the disagreement, it would not invalidate the verdict. … *That is different from disagreement over which offense [of multiple distinct offenses charged in a single count of the indictment] the defendant committed.*") (emphasis added).

Just as in *Miller*, *supra*, and *Conefrey*, *supra*, based on the evidence at Appellant's trial, the prosecution could have charged Appellant with multiple distinct counts alleging violations of 18 U.S.C. § 1591 and multiple distinct counts alleging violations of 18 U.S.C. § 2423. Instead, the prosecution chose to charge one broad count for § 1591 and one broad count for § 2423 – with each count encompassing several distinct alleged offenses spanning a multi-month period. As a result, a specific unanimity instruction was required to assure that jurors had a meeting of the minds on each charged offense concerning the *mens rea* and *actus reus* elements occurring on at least one distinct occasion.

The district court's error deprived Appellant of his Sixth Amendment right to a unanimous jury verdict. *Ramos v. Louisiana*, 590 U.S. 83, 89-93 (2020). This unanimity requirement is violated by jury instructions that permit jurors to convict while not being required to agree about the specific means used to commit the charged offense when there is a serious risk of "unfairness and lacks support in

history or tradition." *United States v. Richardson*, 526 U.S. 813, 820 (1999). As an example of such unfairness, the Court there cited Justice Scalia's concurring opinion in *Schad v. Arizona*, 501 U.S. 624, 651 (1991) (Scalia, J., concurring) ("We would not permit [conviction based on jury instructions tracking] an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday …."). *See Richardson*, 526 U.S. at 820. What occurred in Appellant's case was equivalent. The jury instructions permitted jurors to choose among multiple alleged sex acts between Appellant and Individual-1 *over a multi-month period* in deciding whether he violated the two charges. There can be no assurance that the jury unanimously agreed that Appellant committed, or attempted to commit, or solicited any specific "commercial sex" act with Individual-1 on any specific occasion during the period between February 26 and November 1, 2024.

Although this constitutional error is subject to constitutional harmless-error analysis, the standard is demanding on the Government. *See United States v. Brown*, 202 F.3d 691, 699-703 (4th Cir. 2000). This type of error cannot be harmless unless (1) the jury's verdict shows that it *necessarily* made findings revealing unanimity notwithstanding the omission of a specific unanimity instruction, or (2) a defendant at trial did not contest the Government's allegations regarding all of the various alleged criminal acts spanning the broad count in the indictment *and* there is no evidence on which a rational jury could have acquitted

the defendant. *See id.* at 699-703. Because the jury in Appellant's case did not

*necessarily* make findings demonstrating jury unanimity concerning any specific

act occurring on any specific occasion[25] and further because Appellant denied that

he engaged in, attempted to engage in, or solicited any commercial sex act with

Individual-1 (and even testified on his own behalf, thus providing a rational jury

the basis to acquit), the error cannot be harmless beyond a reasonable doubt.

Because a rationale jury could have acquitted Appellant of both counts – when the

evidence is considered in a light most favorable to Appellant – this Court should

reverse both convictions.

> **ISSUE THREE: The district court erred by denying Appellant's pretrial motion to suppress his statements to law enforcement agents as involuntary.**

### A.    Standard of Review

This Court engages in *de novo* review of Appellant's claim that his

statements to law enforcement agents were involuntary in violation of the Fifth

Amendment but reviews underlying factual findings for clear error. *See United*

*States v. Braxton*, 112 F.3d 777, 781 (4th Cir.1997). Because there are no facts in

---

[25] Although the district court's verdict form asked jurors to specify whether they were unanimous about whether Appellant committed "attempted" and/or "completed" violations of the statutes charged in the superseding indictment, the verdict form did not require jurors to be unanimous about finding that Appellant committed the offenses *on a specific occasion*. JA2311.

dispute – as the relevant events were all recorded – this Court engages in *de novo* review.

**B.** **Ballard and Fisher's "Box-Checking" Deception Rendered Appellant's Statements Involuntary.[26]**

In assessing whether Appellant's statements to law enforcement agents were involuntary, this Court considers the totality of the circumstances surrounding the agents' conduct when eliciting the statements. The critical issue is "whether [Appellant's] will [was] overborne or his capacity for self-determination critically impaired." *Braxton,* 112 F.3d at 781. As the previous extensive quotations from their interrogation of Appellant reveal (*see supra* pages 9-14), Ballard and Vargas interrogated Appellant in a small room at MIA in a manner clearly designed to make Appellant believe that he would not get in any "trouble" for telling the truth about his conduct with Individual-1 and, instead, only would get in trouble if he *lied* about it – which led Appellant to incriminate himself. Ballard and Vargas began the interview by acting as if it were merely a random, routine "box-checking" border interview of Appellant based on the fact that Appellant had been in Colombia. Vargas even claimed he recently had been through the same type of

---

[26] Appellant's pretrial motion also challenged his statements as being a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). On appeal, Appellant limits his challenge to his statements on involuntariness grounds. For purposes of this appeal, Appellant assumes *arguendo* that he validly waived his *Miranda* rights. It is the misconduct of Ballard and Vargas *after* the *Miranda* waiver that is the basis of Appellant's challenge to his statements as involuntary.

routine border interview. They began by asking Appellant diversionary questions about illegal drugs and eventually moved to the topic of his relationship with Individual 1. When Appellant was not forthcoming with incriminating details about his relationship with Individual-1, Ballard and Vargas repeatedly deceived Appellant into believing that he would not get in trouble by admitting additional details and, indeed, once he admitted them, the final "box" would be "checked" and Appellant would be free to catch his flight home.

Ballard said: "Please be honest. I'm sorry. I just don't want you to get yourself in trouble." She then explicitly told Appellant, "no," when he asked whether he was "in trouble." *See supra* pages 11-14. Ballard knew this was a false statement at the time, based on Appellant's prior admission of having "physical and sexual" contact with Individual-1 combined with the WhatsApp texts and photographs that Ballard already had seen on Appellant's iPhone.[27] Ballard and Vargas then continued the interrogation, and Appellant incriminated himself further.

The law on involuntary confessions is well-established:

[G]overnment agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary. … *Nevertheless, there are certain promises whose attraction renders a resulting confession involuntary if the*

---

[27] Even before she interviewed Appellant, Ballard testified that she believed that she possessed evidence of Appellant's commission of a sex offense. JA0464-0465.

*promises are not kept, and the defendant's perception of what government agents have promised is an important factor in determining voluntariness.*

*United States v. Shears*, 762 F.2d 397, 401-02 (4th Cir. 1985) (citations omitted; emphasis added); *id.* at 402 n.5 (noting that, when a promise goes unfulfilled, the court must determine whether the promise "was the principal and determinative factor leading to [the] confession"); *United States v. Santiful*, 701 Fed. App'x 242, 244 n.1 (4th Cir. 2017) (noting "statements may be deemed involuntary … if they arise after false assurances that a defendant's statements may not be used against him") (citations omitted); *see also United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987) ("General encouragement to cooperate is far different from specific promises of leniency.").

Ballard and Vargas gave repeated assurances to Appellant that, if he told the truth about his sexual conduct with Individual-1, Appellant would not get in trouble. Their false promises deceived Appellant and caused him to make incriminating statements that were used against him at his subsequent trial. This pattern of deception by Ballard and Vargas overcame Appellant's will by undermining his capacity for self-determination. *See Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir.), *reh'g denied*, 818 F.2d 865 (5th Cir. 1987) ("[C]ertain promises, if not kept, are so attractive that they render a resulting confession involuntary. A promise … that any statement will not be used against the accused

42

is such a promise."); *see also United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993) (noting that, in view of the "uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances"); *United States v. Lall*, 607 F.3d 1277, 1286 (11th Cir. 2010) (citing *Streetman* and *Walton* with approval); *cf. United States v. Giddins*, 858 F.3d 870, 883-84 (4th Cir. 2017) ("Giddins … argues that the officers engaged in unfair coercion by lying to him about whether or not he was in trouble during the course of the interview. …. [W]e agree with Giddins that [the officers'] actions were improper."). The fact that Appellant previously waived his *Miranda* rights does not foreclose his involuntariness claim. *State v. Clark*, 799 S.E.2d 192, 195 (Ga. 2017) ("If defendant believed that his statement could not be used against him, despite the earlier *Miranda* warnings, his statement made as a result of that false assurance could not be a free and voluntary one.") (citation and internal quotation marks omitted).

Although hardly necessary for the success of Appellant's due process challenge to his statements, it is noteworthy that (1) Appellant was physically and emotionally exhausted because of a lack of sleep the night before and (2) Appellant had no meaningful prior experience with the criminal justice system (having a

single misdemeanor charge, which was dismissed, over a decade before). JA0845, JA2316-2317.

Because Appellant's statements at MIA were involuntary, the district court erred by denying Appellant's motion to suppress them. The admission of Appellant's statements at trial was not harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18 (1967) (harmless-error standard for constitutional errors). The proper *Chapman* harmless-error analysis is not whether an appellate court believes that a jury still would have convicted the defendant if there had been no constitutional error; instead, the proper analysis is whether the appellate court can conclude with confidence that "the guilty verdict actually rendered in this trial was *surely unattributable to the error*." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis added). As discussed *supra*, the Government introduced evidence of Appellant's statements at MIA through Ballard's testimony at trial. The Government thus cannot prove that the jury's verdict was "surely unattributable" to the admission of the involuntary statements.

**C. The Involuntariness of Appellant's November 1, 2024 Statements at MIA Tainted Both the Search Warrants and Appellant's November 4, 2024 Statements at Dulles.**

Appellant contended that the district court should suppress not only his statements at MIA but also all "evidence that was obtained as a direct result of the impermissibly obtained statements during the Miami Interview, including the

electronic evidence obtained from search warrants that are based on those same statements as well as his interview at Dulles International Airport." JA2053, JA270, JA348. As noted *supra*, the district court did not address this claim because, as a threshold matter, the district court found that Ballard and Vargas did not engage in misconduct that rendered Appellant's statements at MIA involuntary. If this Court agrees that Appellant's statements at MIA were involuntary, this Court should remand with instructions that, in the event of a new trial at which the Government intends to offer Appellant's statements made at Dulles, the district court must explicitly rule on whether the Appellant's statements at Dulles also were involuntary based on their taint from the coercive government misconduct at MIA.

**ISSUE FOUR: The district court erred by failing to suppress the evidence obtained from an unreasonable search of Appellant's smartphones in violation of the Fourth Amendment.**

**A. Standard of Review**

"In reviewing a district court's denial of a motion to suppress, [this Court] review[s] the legal conclusions regarding Fourth Amendment violations *de novo* and any underlying factual determinations for clear error." *United States v. Williams*, 130 F.4th 177, 184 n.2 (4th Cir. 2025).

**B. The Government's Warrantless Search of Appellant's Smartphones Violated the Fourth Amendment Because There Was No Showing of a Nexus Between the Searches and Any Border-Protection Justification.[28]**

**1. Introduction**

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Absent some applicable exception to the Fourth Amendment's warrant and probable cause requirements, a law enforcement officer must obtain a search warrant, supported by probable cause, to search or seize a person's property. *See Riley v. California*, 573 U.S. 373, 382 (2014).

A sovereign has the right to protect its borders by preventing the entry of contraband and uncovering matters related to the sovereign's legitimate interests at the border (e.g., collecting import duties and preventing the commission of transnational crime). *See United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985). Government agents at the international border thus do not need either a search warrant or probable cause to conduct "routine searches of the persons and effects of entrants." *Id*. at 538. But when a border search is *non-routine,* the Court adopted the well-established "reasonable suspicion" standard as the "border

---

[28] Appellant notes that also pending before this Court is *United States v. Belmonte Cardozo*, No. 25-4239 (4th Cir.), raising similar issues to the Fourth Amendment issues raised here by Appellant.

search" exception to the warrant and probable cause requirements. The Court held that, in determining whether a more particularized search is appropriate, agents must "reasonably suspect that the traveler is smuggling contraband." *Id*. at 541. The Court highlighted that officials at the border must have a "particularized and objective basis for suspecting the particular person" of smuggling contraband before they can perform a non-routine search. *Id.* at 541-42.

In *United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019), this Court held that, to conduct a "forensic" search of the data on an entrant's smartphone "under the border search exception (that is, without a warrant), the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *Id.* at 721; *accord United States v. Nkongho*, 107 F.4th 373, 382 (4th Cir. 2024).

In *United States v. Kolsuz,* 890 F.3d 133 (4th Cir. 2018), this Court left open the issue of whether a so-called "manual" – as opposed to "forensic" – search of a smartphone is subject to the same requirements as a "forensic" search. *Id.* at 140-141 & n.2 (noting "Kolsuz does not challenge the manual search of his smartphone" and, thus, "[w]e thus have no occasion to consider application of the

border exception to manual searches of electronic devices").[29] As Appellant contends *infra*, this Court should not draw any distinction between a "manual" and "forensic" search of a smartphone under the Fourth Amendment. In any event, as further discussed *infra*, the Government did not conduct a mere "manual" search of Appellant's smartphones.

The district court ruled that the search in this case was "routine" or – alternatively, if "non-routine" – "was based on reasonable suspicion of the commission of a transnational crime." JA0006-0008. For the reasons set forth below, the court erred in both holdings: the search was non-routine and was not supported by reasonable suspicion.

### 2. The Heightened Privacy Interests in Smartphones Under *Riley*

In *Riley*, the Supreme Court recognized that the digital content of a smartphone is qualitatively different from other types of personal property and, thus, must receive greater protection under the Fourth Amendment:

> The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.… Even the most

---

[29] In dicta, Court distinguished between the two types of searches as follows: "['Manual'] searches …are examinations of an electronic device that do not entail the use of external equipment or software. …['Forensic'] searches involve the connection of external equipment to a device…. in order to review, copy, or analyze its contents .…" *Kolsuz*, 890 F.3d at 146 n.6.

> basic phones … might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on.… The storage capacity of cell phones has several interrelated consequences for privacy.… The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet.… The average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life.

*Riley*, 573 U.S. at 394-97.

Although *Riley* prohibited the use of warrantless "searches incident to arrest" to search data on smartphones (and did not specifically address searches at the international border), a similar heightened protection of smartphones logically extends to warrantless searches at the international border – which the Supreme Court has likened to the search-incident-to-arrest exception as a longstanding sweeping exception. *See United States v. Ramsey*, 431 U.S. 606, 621 (1977). Because *Riley* placed a specific limitation on otherwise sweeping warrantless searches of smartphones incident to arrest, the same limitation should exist for border searches of smartphones.

The Court in *Riley* did not distinguish between warrantless "manual" and "forensic" searches of smartphones; all types of smartphone searches are prohibited as warrantless searches incident to arrest. The same should be true with respect to searches of smartphones at the border. *Riley* should foreclose any distinction between the two, as both are severe intrusions into a person's privacy.

In any event, nothing about the searches in this case can fairly be characterized as "manual" by any ordinary meaning of that term. The ordinary meaning of the adjective "manual" is "worked or done by hand and not by machine."[30] The searches of Appellant's smartphones were not done solely by hand. Agent Ballard admitted that she initially used the WhatsApp search function to locate texts with terms like "minor" (in Spanish), which led her to the incriminating communications between appellant and Individual-1. To suggest that those searches were "manual" is contrary to any common-sense understanding of the term. Merely because an "external device" was not initially used in the searching does not make the searches "manual."

### 3. The District Court Erred by Concluding that the Government Had "Reasonable Suspicion" to Invoke the Border Exception.

In *Aigbekaen*, as discussed *supra*, this Court held that the border search exception may not be used to identify evidence of an ordinary crime and, instead, is limited to intercepting contraband and evidence falling within the sovereign's border-related interests. *Aigbekaen*, 943 F.3d at 722. In *Nkongho*, the Court held that the Government may *seize* an entrant's smartphone without a warrant if officials have at least "reasonable suspicion" to believe that the phone contains evidence of "an offense that bears some nexus to the border search exception's

---

[30] *See* MERRIAM WEBSTER DICTIONARY, "Manual," https://www.merriam-webster.com/dictionary/manual (last visited May 28, 2026).

purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband," including evidence of "ongoing transnational criminal activity." *Nkongho*, 107 F.4th at 382 (citation and internal quotation marks omitted). However, given that the Government had probable cause of such border nexus at the time of the seizure (and proceeded to get a search warrant to conduct a *search*), this Court noted that it was electing to follow the path taken in *Aigbekaen* and *Kolsuz* and not rule on the reasonable-suspicion issue related to a search of a smartphone. *Id.* at 382 (noting "the district court applied a reasonable suspicion standard," but stating that "we . . . need not decide whether that ruling was correct" because the Government possessed probable cause).

Under this precedent, Appellant should prevail in his Fourth Amendment challenge to the Government's warrantless searches of his smartphones. When officials seized and searched Appellant's smartphones, the Government lacked reasonable suspicion that they contained contraband or evidence related to (1) protecting national security, (2) collecting duties, (3) the entry of unwanted persons, or (4) the import or export of contraband. Indeed, Ballard admitted that the purported border search served as a substitute for the Government's inability to secure a search warrant as to Appellant's actions in Colombia. See *supra* at pages 5-6.

At the time of the searching at MIA, the Government knew that Appellant had gone to Colombia on a regular basis during the past year. But that provided no particularized and objective basis to conclude that Appellant carried any contraband nor that his smartphones were involved in transnational crimes. Ballard admitted that she was not aware that Appellant was a resident of Colombia nor that Appellant had two children who lived in Colombia. Likewise, Ballard admitted that she made no effort independently to determine the reasons for Appellant's frequent trips to Colombia. JA0458-0463. Without more, the fact of his frequent travel to Colombia does not support an objectively reasonable inference that Appellant's smartphones had contraband or evidence of any matter falling within a legitimate border search. Any other conclusion would subject every frequent foreign traveler to having their smartphones scrutinized on entry to the United States.

The Government and district court also read too much into the fact that, *over a year before*, Appellant had sent small amounts of money to a woman in Colombia (David) who had been associated with an unrelated third party (Correa) who had engaged in "sex tourism" with minors. The Government had no evidence whatsoever that Appellant had any connection to Correa. The clearly "stale" year-old Western Union transfers to David likewise offered no particularized and objectively reasonable inference that Appellant had contraband or that his

smartphone contained evidence of any transnational crime.[31] Without any evidence of any ties between Appellant and Correa, the money-transfers to David offered no objectively reasonable evidence supporting reasonable suspicion of border-related contraband or transnational crime.

The Government's contention that two other factors – Appellant's "unexplained" association with a Virginia nonprofit to which the Government misleadingly referred as an El Salvadoran toy charity, and Appellant's long-ago dismissed domestic assault charge – did not shore up the deficiency in the Government's proof justifying a search of Appellant's smartphones. Publicly-available records from the Virginia State Corporation Commission (VSCC) show Appellant once was an officer of a long-defunct Virginia nonprofit.[32] Besides being unduly stale information, this fact adds nothing to any particularized and objective inference that Appellant's smartphones likely contained contraband or

---

[31] *See United States v. Grubbs*, 547 U.S. 90, 95 & n.2 (2006) (noting "stale" information can render a search based on such information in violation of the Fourth Amendment).

[32] This Court can take judicial notice of the records of the VSCC that lists Appellant as one of three officers of a Virginia nonprofit (*i.e.*, nonstock) corporation "Toys para los Cipotes, Inc." (Entity # 07701196), defunct since 2016, established with his then-wife and his sister-in-law in 2013. *See* https://cis.scc.virginia.gov/ (last visited May 29, 2026). The purpose of the nonprofit per its Articles of Incorporation was to receive toys, school supplies, and other goods for underserved children. This publicly-available information was available to Agent Ballard when she searched Appellant's smartphones.

evidence of transnational crime. Regarding the 2013 domestic-assault charge, Appellant was arrested and the case dismissed over a decade before the warrantless searches of his smartphones. That alleged incident did not involve a minor. JA2315.

These two factors do not justify a plausible inference that Appellant's smartphones contained contraband or the types of evidence for which legitimate border searches are permitted. "[A]n officer and the Government must do more than simply label a behavior as "suspicious" to make it so. *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011).

The four grounds relied on by the Government and district court, individually or collectively, fail to provide a particularized and objective basis for a finding of reasonable suspicion that Appellant's smartphones contained border contraband or evidence subject to a legitimate border search. Ballard may have had a "hunch" about Appellant when he flew into MIA, yet reasonable suspicion "require[s] something more than 'inchoate and unparticularized suspicion or hunch." *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (*quoting Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Because the Government lacked reasonable suspicion, the warrantless searches of Appellant's smartphones violated the Fourth Amendment.

### 4. The Good-Faith Exception Does Not Apply.

The district court did not invoke the "good-faith exception" to the Fourth Amendment's warrant requirement as an alternative basis for permitting evidence of the searches of Appellant's smartphones to be introduced. But the Government made that alternative argument – contending that Ballard's warrantless border search was consistent with "binding" appellate precedent then in effect in the Eleventh Circuit, in which MIA is located. JA0158, JA0170, JA0192. The Government's argument lacks merit.

This Court should reject the Government's attempt to create a "silver platter doctrine" version of the good-faith exception based on differing circuit precedent. *Cf. Elkins v. United States*, 364 U.S. 206, 208, 223-24 (1960). Ballard's actions were not permitted by Fourth Circuit precedent (in which Appellant was prosecuted) and should not be excused on the ground that Eleventh Circuit (where the searches occurred) permitted her warrantless searches. In *Elkins*, the Court addressed an analogous situation:

> [E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial. In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out.

*Id.* at 223-24.

Nor does the Government's alternative reliance on *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005), support application of the good-faith exception. JA0193 (footnote 18). *Ickes* involved a warrantless search of a computer found in a van crossing the border. But officials first discovered child pornography photos and videos (clearly constituting probable cause or at least reasonable suspicion of child pornography on the computer) before they searched the computer and disks (which revealed more child pornography). *Id.* at 507.

Moreover, *Ickes* did not address warrantless searches of modern smartphones, where the information resides not on any external drive, but rather in the cloud and is accessible from anywhere only due to the phone's powerful computing capabilities. And *Ickes* was decided well before *Riley*. Under *Riley*, a modern smartphone is qualitatively different under the Fourth Amendment from the type of computer at issue in *Ickes*. The border search in *Ickes* occurred *in 2000* (*see Ickes*, 393 F.3d at 502), when computers were significantly less robust than modern smartphones with respect to their technological capacities and the corresponding privacy implications for users. In particular, the computer in *Ickes* did not "reveal[] [a] montage of the user's life" in the same manner that Appellant's cellphones did. *Riley*, 573 U.S. at 397. *Ickes* does not support the Government's position.

Therefore, the district court erred by not suppressing evidence from Appellant's smartphones and any "fruits" of that "tainted" evidence – including the subsequent "forensic" search of appellant's phone and appellant's statements made to agents at MIA and Dulles airports. *See Fahy v. Connecticut*, 375 U.S. 85, 91 (1963); *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). As Appellant explained in the court below, "the contents derived from the iPhone [s]earch permeate[d] every step of the agents' evidence-collection steps after [Appellant's] arrival in Miami." JA0108. This error clearly is not harmless beyond a reasonable doubt.

> **ISSUE FIVE: At the very least, reversal is required because of the cumulative prejudice resulting from all the errors occurring at trial.**

"Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Runyon*, 707 F.3d 475, 520 (4th Cir. 2013) (citation and internal quotation marks omitted). Assuming *arguendo* that any of the previously-discussed errors individually were harmless, cumulatively the multiple errors prejudiced Appellant and require a new trial.

## CONCLUSION

This Court should reverse Appellant's convictions and remand for a new trial. Appellant respectfully requests that this Court address Issues One through Four even if this Court decides to reverse solely on one issue, as the other three issues potentially will recur at a retrial.

Dated: June 2, 2026                    Respectfully submitted,

                                       */s/ Brent Evan Newton*
                                       Brent Evan Newton
                                       Attorney at Law
                                       19 Treworthy Road
                                       Gaithersburg, MD 20878
                                       (202) 975-9105
                                       brentevannewton@gmail.com

                                       **Attorney for Appellant**
                                       **Michael Jaime Inofuentes**

## STATEMENT CONCERNING ORAL ARGUMENT

Appellant requests oral argument. The issues raised in this brief are complex, and oral argument would aid the decisional process of this Court.

*/s/ Brent Evan Newton*
Brent Evan Newton

## CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,977 words. This brief complies with the typeface and type-style requirements because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Brent Evan Newton*
Brent Evan Newton