**26-4150**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff–Appellee,*

v.

MICHAEL INOFUENTES,

*Defendant–Appellant.*

On appeal from the United States District Court for the
Eastern District of Virginia — No. 1:25-cr-00005-PTG

# BRIEF OF AMICI CURIAE THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AND REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF DEFENDANT–APPELLANT

Bruce D. Brown
Gabriel Rottman
Grayson Clary
Reporters Committee for Freedom
  of the Press
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300

Stephanie Krent
Raya Koreh
Scott B. Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-4150__          Caption: __United States v. Michael Inofuentes__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Knight First Amendment Institute at Columbia University__
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                    ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                       ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __s/ Stephanie Krent_____      Date: _____06/09/2026_____

Counsel for: __Knight First Amendment Institute at Columbia University__

Text

- 2 -

| Print to PDF for Filing | | Reset Form |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _26-4150_      Caption: _United States v. Michael Inofuentes_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Reporters Committee for Freedom of the Press_
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Stephanie Krent     Date: 06/09/2026

Counsel for: Reporters Committee for Freedom of the Press

- 2 -

[ Print to PDF for Filing ]     [ Reset Form ]

**Table of Contents**

Table of Authorities ................................................................ iii

Interest of Amici Curiae ...........................................................1

Introduction ............................................................................1

Argument.................................................................................3

I.  Government searches of electronic devices burden First and Fourth Amendment freedoms...........................................................3

    A.  Government searches of electronic devices at the border burden the freedom of the press. ..................................5

    B.  Government searches of electronic devices at the border intrude on travelers' right to privacy and the freedoms of speech and association...............................................8

II.  The government's searches of Mr. Inofuentes's cell phones were unconstitutional...................................................................11

    A.  Absent probable cause, searches of electronic devices at the border violate the First Amendment. ...........................14

        1.  Searches of electronic devices at the border trigger First Amendment scrutiny..................................14

        2.  Device searches not predicated on probable cause cannot survive any form of heightened scrutiny. ...............15

    B.  Absent probable cause, searches of electronic devices at the border violate the Fourth Amendment...........................19

        1.  Manual searches of electronic devices at the border are profound intrusions upon personal privacy. ..................22

        2.  Granting border agents broad discretion to search electronic devices does not serve the government interests underlying the border-search exception...............23

i

3.     The balance of interests requires at least probable cause of a border-related offense when the government searches electronic devices at the border. .......25

Conclusion.................................................................................27

Certificate of Compliance ...........................................................29

## Table of Authorities

**Cases**

*Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021) ........................................14, 19, 27

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)..............................15, 16

*Ashcraft v. Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000).....................................6, 16

*Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971) ........................................................15

*Carpenter v. United States*, 585 U.S. 296 (2018) ..............................................21, 26

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988)......................18

*Guan v. Mayorkas*, 530 F. Supp. 3d 237 (E.D.N.Y. 2021) ......................................7

*In re Application of Shervin Pishevar for an Order to Take Discovery for Use in Foreign Proc. Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290 (S.D.N.Y. 2020) .................................................................6

*In re Search of the Real Prop. & Premises of Hannah Natanson*, No. 1:26-SW-00054 (WBP), 2026 WL 510727 (E.D. Va. Feb. 24, 2026) ..............................................................................................................20

*Marcus v. Search Warrants*, 367 U.S. 717 (1961)..................................................20

*Maryland v. Macon*, 472 U.S. 463 (1985) ..............................................................20

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ...................................16

*NAACP v. Button*, 371 U.S. 415 (1963) ...................................................................4

*Nieves v. Bartlett*, 587 U.S. 391 (2019) .................................................................14

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ...............18

*Riley v. California*, 573 U.S. 373 (2014) .........................................................passim

*Stanford v. Texas*, 379 U.S. 476 (1965) ...........................................................20, 27

*United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019)................................passim

*United States v. Alisigwe*, No. 1:22-cr-425 (VEC), 2023 WL 8275923
    (S.D.N.Y. Nov. 30, 2023) ....................................................................................23

*United States v. Arnold*, 533 F.3d 1003 (9th Cir. 2008) .......................................19

*United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019)...............................24, 25, 27

*United States v. Castillo*, 70 F.4th 894 (5th Cir. 2023).............................................27

*United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005) ..............................................19

*United States v. Jones*, 565 U.S. 400 (2012)...........................................................17

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018)....................................passim

*United States v. LaRouche Campaign*, 841 F.2d 1176 (1st Cir. 1988) .....................6

*United States v. Mendez*, 103 F.4th 1303 (7th Cir. 2024)...............................26, 27

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) ............................26

*United States v. Nkongho*, 107 F.4th 373 (4th Cir. 2024) ................................2, 25

*United States v. Ramsey*, 431 U.S. 606 (1977) ......................................................14

*United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023)..........................24, 25

*United States v. Sultanov*, 742 F. Supp. 3d 258 (E.D.N.Y. 2024) ...................passim

*United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018)......................................27

*United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S.
    297 (1972) .......................................................................................................17

*United States v. Xiang*, 67 F.4th 895 (8th Cir. 2023)............................................27

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .............................................16

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) ....................................................16

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978)............................................3, 20, 26

**Other Authorities**

Alexandra Ellerbeck, *Security Risk for Sources as U.S. Border Agents Stop and Search Journalists*, Comm. to Protect Journalists (Dec. 9, 2016), https://perma.cc/VJ9L-HUG5 ...................................................................6

Alistair Kitchen, *How My Reporting on the Columbia Protests Led to My Deportation*, The New Yorker (June 19, 2025), https://perma.cc/AFY3-AL6P ...................................................................8

Amicus Br., *United States v. Kamaldoss*, No. 24-824 (2d Cir. Nov. 1, 2024), ECF No. 64 ....................................................................................2

*AP Chief Points to Chilling Effect After Justice Investigation*, Reps. Comm. for Freedom of the Press (June 19, 2013), https://perma.cc/U7Z8-FPEK....................................................................6

*Border Searches of Electronics at Ports of Entry, FY 2024 Statistics*, U.S. Customs & Border Prot., https://perma.cc/9PYJ-CNUR............................4

*Border Searches of Electronics at Ports of Entry, FY 2025 Statistics*, U.S. Customs & Border Prot., https://perma.cc/42JU-LACF ............................4

CBP Directive No. 3340-049A, Border Search of Electronic Devices (Jan. 4, 2018), https://perma.cc/3QKY-MPGR..................................................4

CBP Directive No. 3340-049B, Border Search of Electronic Devices (Jan. 1, 2026), https://perma.cc/6FG7-FE9E .....................................................4

*CBP Electronic Media Report (7/26/2017)*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/X5QF-V5CU.............................................10

*CBP Electronic Media Report (9/03/2017)*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/KVJ9-7PXR.............................................10

Compl., *Springer v. United States*, No. 8:25-cv-00947 (M.D. Fla. Apr. 15, 2025), ECF No. 1 ...................................................................................8

*CRCL Complaint Closure (07/11/2017)*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/2GDA-F7G6 ...................................................9

*CRCL Complaint Intake Form (5/27/2018)*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/W7K3-2JQH ................................................9

ICE Directive No. 7-6.1, Border Searches of Electronic Devices (Aug. 18, 2009), https://perma.cc/9455-Z2AX .............................................................4

*Introduction to the Reporter's Privilege Compendium*, Reps. Comm. for Freedom of the Press, https://perma.cc/LQ7X-AAJA ....................................6

Johana Bhuiyan, *Pro-Palestinian protester's lawyer stopped and searched at US border: 'They were going to take my device'*, The Guardian (Apr. 12, 2025), https://perma.cc/8LBC-LWWW ..............................10

Joseph Cox, *WSJ Reporter: Homeland Security Tried to Take My Phones at the Border*, Motherboard (July 21, 2016), https://perma.cc/BMN9-96LW ........................................................................7

*Knight First Amend. Inst. at Columbia Univ. v. DHS*, No. 1:17-cv-00548 (TSC) (D.D.C. 2017)...................................................................................8

Matt Burgess, *Phone Searches at the US Border Hit a Record High*, Wired (Aug. 20, 2025), https://perma.cc/6YPU-WL39 ........................................4

Mot. for Summ. J., Ex. 20, *Alasaad v. Mayorkas*, No. 1:17-cv-11730 (DJC) (D. Mass. Apr. 30, 2019), ECF No. 91-19, https://perma.cc/KL6B-7QDW .......................................................................4

Oscar Margain, *Immigration Attorney sues Trump administration after phone seized at Logan*, NBC10 Boston (Oct. 21, 2025), https://perma.cc/6YEP-7FXT...............................................................................10

Robert Mackey, *French Scientist Denied US Entry After Phone Messages Critical of Trump Found*, The Guardian (Mar. 19, 2025), https://perma.cc/927T-SQRL...............................................................................10

Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the Border Face Coordinated Harassment from U.S. and Mexican*

*Authorities*, The Intercept (Feb. 8, 2019), https://perma.cc/SR2Y-Y8KR ..............................................................................................7

*With Liberty to Monitor All: How Large-Scale US Surveillance Is Harming Journalism, Law, and American Democracy*, Human Rights Watch (2014), https://perma.cc/KUH6-4MVF .......................................6

**Interest of Amici Curiae**

Amici curiae are the Knight First Amendment Institute at Columbia University and the Reporters Committee for Freedom of the Press. As organizations that advocate for the First Amendment rights of the press and public, amici have a strong interest in ensuring that searches of electronic devices at the border honor constitutional limits. Amici have filed amicus briefs in other cases similar to this one, including in *United States v. Belmonte Cardozo*, No. 25-4239 (4th Cir. 2025).[1]

**Introduction**

Personal electronic devices have become extensions of the human mind. Cell phones and laptops store enormous volumes of individuals' private information and expressive materials: journalists' work product; travelers' private thoughts and personal and professional associations; and digital records of travelers' whereabouts and communications. Because of the scale and sensitivity of the information stored on electronic devices, even manual searches of them pose a grave threat to privacy as well as to the freedoms of speech, association, and the press.

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief. All parties consented to the filing of this brief.

Recognizing the "unparalleled breadth" and "uniquely sensitive nature" of information stored on cell phones, this Court has already concluded that the Constitution requires border agents to have, at a minimum, a reasonable suspicion of a border-related offense before conducting a forensic search of a cell phone. *See United States v. Kolsuz*, 890 F.3d 133, 145, 148 (4th Cir. 2018); *see also United States v. Nkongho*, 107 F.4th 373, 382 (4th Cir. 2024); *United States v. Aigbekaen*, 943 F.3d 713, 720–21 (4th Cir. 2019). It should now resolve the questions left open by *Kolsuz*, *Aigbekaen*, and *Nkongho* by holding that, in light of the First and Fourth Amendment interests at stake, both manual and forensic searches of electronic devices must be supported by at least probable cause of a border-related offense.[2]

Like forensic searches, manual searches of electronic devices burden travelers' expressive and privacy rights and have particularly serious implications for the newsgathering rights of journalists. These searches chill travelers' ability to express themselves, join political or religious groups, or read and receive information from others. They therefore trigger the protections of the First Amendment, which stands as an independent bulwark against unregulated searches

---

[2] Amici have argued that these searches are unconstitutional in the absence of a warrant because of the burdens they place on travelers in general and journalists in particular. *See, e.g.*, Amicus Br., *United States v. Kamaldoss*, No. 24-824 (2d Cir. Nov. 1, 2024), ECF No. 64. Absent controlling Circuit law indicating that a warrant is not required, even for forensic device searches, *see Kolsuz*, 890 F.3d at 143; *Aigbekaen*, 943 F.3d at 720 n.5, amici would press the same argument here.

2

that implicate expressive and associational rights. Absent probable cause, border searches of electronic devices cannot survive any form of heightened scrutiny, because they are not narrowly tailored to serve a substantial government interest and do not leave open alternative channels of communication for travelers or journalists. These searches also violate the Fourth Amendment, which must be applied with "scrupulous exactitude" when searches implicate expressive rights. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). Given the profound expressive and privacy interests at stake, and the risk that device searches will transgress the bounds of the original justification for the border-search exception, the Fourth Amendment requires no less than probable cause for manual and forensic searches alike.[3]

## Argument

### I. Government searches of electronic devices burden First and Fourth Amendment freedoms.

Policies promulgated by U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) permit border agents to search journalists' and other travelers' electronic devices without a warrant or probable

---

[3] Amici take no position on whether reasonable suspicion of a border-related offense existed in this case or on the other issues raised by the parties in this appeal.

3

cause, and often without any suspicion at all.[4] In recent years, ICE and CBP have conducted these searches frequently—in fiscal year 2025, for example, CBP conducted over 55,000 of them.[5] That number constitutes a more than 17 percent increase from fiscal year 2024.[6] While it would be clear even absent specific evidence that these invasive searches implicate expressive and highly sensitive information protected by the First and Fourth Amendments and constrict the "breathing space" that First Amendment freedoms need "to survive," *NAACP v. Button*, 371 U.S. 415, 433 (1963), their implications for privacy, association, and

---

[4] ICE's policy authorizes suspicionless searches of electronic devices at the border regardless of the search method used. ICE Directive No. 7-6.1, Border Searches of Electronic Devices (Aug. 18, 2009), https://perma.cc/9455-Z2AX. In May 2018, ICE issued an internal directive temporarily requiring reasonable suspicion to conduct "advanced" searches—those using "external equipment" to "review, copy and/or analyze [a device's] contents." *See* Mot. for Summ. J., Ex. 20, *Alasaad v. Mayorkas*, No. 1:17-cv-11730 (DJC) (D. Mass. Apr. 30, 2019), ECF No. 91-19, https://perma.cc/KL6B-7QDW. CBP's policy authorizes suspicionless searches unless they are "advanced," in which case "reasonable suspicion" or a "national security concern" is required. CBP Directive No. 3340-049B, Border Search of Electronic Devices (Jan. 1, 2026), https://perma.cc/6FG7-FE9E. An earlier version of this CBP policy was in operation at the time of the search at issue in this case, but the same standard applied. *See* CBP Directive No. 3340-049A, Border Search of Electronic Devices (Jan. 4, 2018), https://perma.cc/3QKY-MPGR.

[5] *Border Searches of Electronics at Ports of Entry, FY 2025 Statistics*, U.S. Customs & Border Prot., https://perma.cc/42JU-LACF. Between April and June 2025, CBP searched almost 15,000 devices, "more . . . than ever before" in a single quarter. Matt Burgess, *Phone Searches at the US Border Hit a Record High*, Wired (Aug. 20, 2025), https://perma.cc/6YPU-WL39.

[6] *See Border Searches of Electronics at Ports of Entry, FY 2024 Statistics*, U.S. Customs & Border Prot., https://perma.cc/9PYJ-CNUR (reporting 47,047 border searches of electronic devices in fiscal year 2024).

4

expression are well-documented through news reporting, transparency litigation, and journalists' and travelers' personal accounts.

### A. Government searches of electronic devices at the border burden the freedom of the press.

Electronic devices are critical tools for the modern-day press. For journalists on assignment, they serve as notebooks, "cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, [and] newspapers." *Riley v. California*, 573 U.S. 373, 393 (2014). Unfettered government access to journalists' devices interferes with journalists' ability to guarantee confidentiality to sources and thereby impedes their ability to gather the news and inform the public. Border agents can also use device searches to intimidate and deter journalists from pursuing investigations that government officials perceive to be hostile or politically inconvenient.

First, the threat of unregulated electronic device searches undermines the relationship between potential sources and the press, damming the free flow of information to the public. Many sources are willing to speak to reporters only with an assurance of confidentiality because they reasonably fear retribution if their identities are revealed. As courts have recognized, "a journalist's ability to foster and maintain confidential relationships with sources is essential to effective reporting." *In re Application of Shervin Pishevar for an Order to Take Discovery for Use in Foreign Proc. Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290, 306

5

(S.D.N.Y. 2020). Though not absolute, the protection of that confidentiality is "necessary to ensure a free and vital press, without which an open and democratic society would be impossible to maintain." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000).[7]

But reporters who travel internationally cannot credibly offer sources confidentiality if the mere act of crossing the border exposes their electronic devices to search and the identities of their contacts to disclosure.[8] When border agents can mine any journalist's work product at will, the press runs "the disadvantage of . . . appearing to be an investigative arm of the judicial system or a research tool of government" rather than an independent check on it. *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (cleaned up). Reporters have often described this dynamic in past controversies involving government investigations of the news media.[9] The suspicionless search authority the government defends here poses the same risk to the free flow of information to the public.

---

[7] *See also Introduction to the Reporter's Privilege Compendium*, Reps. Comm. for Freedom of the Press, https://perma.cc/LQ7X-AAJA.

[8] *See, e.g.,* Alexandra Ellerbeck, *Security Risk for Sources as U.S. Border Agents Stop and Search Journalists*, Comm. to Protect Journalists (Dec. 9, 2016), https://perma.cc/VJ9L-HUG5.

[9] *See, e.g.*, *AP Chief Points to Chilling Effect After Justice Investigation*, Reps. Comm. for Freedom of the Press (June 19, 2013), https://perma.cc/U7Z8-FPEK; *see also With Liberty to Monitor All: How Large-Scale US Surveillance Is Harming Journalism, Law, and American Democracy* at 3–4, Human Rights Watch (2014), https://perma.cc/KUH6-4MVF.

Second, border agents may also use their authority to single out journalists crossing the border for electronic device searches, possibly in retaliation for reporting perceived as critical of the government. In recent years, a flurry of news reports documented a clear pattern of harassment at the border of journalists covering migration issues, including searches and seizures of their electronic devices.[10] A court concluded, in a suit filed by five photojournalists whose names appeared in a secret CBP database used to monitor those reporters, that their allegations stated a violation of their First Amendment rights. *Guan v. Mayorkas*, 530 F. Supp. 3d 237 (E.D.N.Y. 2021). In a separate July 2016 incident, U.S. border agents attempted to search two cell phones belonging to a *Wall Street Journal* journalist whose recent work had reportedly "deeply irked the US government," and whose previous reporting had sparked a congressional investigation into corruption in the military.[11] And just last summer, U.S. border agents searched the phone of an Australian independent journalist who reported on the student protests at Columbia University and interrogated him about the names of his sources and the names of

---

[10] *See, e.g.*, Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the Border Face Coordinated Harassment from U.S. and Mexican Authorities*, The Intercept (Feb. 8, 2019), https://perma.cc/SR2Y-Y8KR.

[11] Joseph Cox, *WSJ Reporter: Homeland Security Tried to Take My Phones at the Border*, Motherboard (July 21, 2016), https://perma.cc/BMN9-96LW.

students involved in the protests.[12] Border agents also seized the electronic devices of an American journalist and filmmaker who writes about racial and reproductive justice, queer identity, and Palestinian human rights. *See* Compl., *Springer v. United States*, No. 8:25-cv-00947 (M.D. Fla. Apr. 15, 2025), ECF No. 1. So long as the government has broad authority to conduct device searches at the border, the risk of this sort of abuse remains.

**B.    Government searches of electronic devices at the border intrude on travelers' right to privacy and the freedoms of speech and association.**

Unregulated device searches at the border have implications not just for journalists but for ordinary travelers as well. These searches chill travelers' First Amendment-protected activities and intrude on their Fourth Amendment privacy rights. Through FOIA litigation, *see Knight First Amend. Inst. at Columbia Univ. v. DHS*, No. 1:17-cv-00548 (TSC) (D.D.C. 2017), amicus the Knight Institute has obtained thousands of records documenting device searches conducted by CBP and ICE. The records are a reminder of the private and often intimate nature of the information stored on travelers' cell phones and laptops, and they underscore the risk that, in the absence of strong constitutional protections, border agents will use their authority in arbitrary and discriminatory ways.

---

[12] Alistair Kitchen, *How My Reporting on the Columbia Protests Led to My Deportation*, The New Yorker (June 19, 2025), https://perma.cc/AFY3-AL6P.

In many instances, border agents conducting electronic device searches appeared to use the information they were rifling through to ask intrusive questions about travelers' religious beliefs and political affiliations. For example, in one incident, border agents ordered a traveler to hand over his devices as well as his cell phone and computer passwords. When he asked whether the officers needed a warrant, one officer replied, "This is the border. We don't need anything." The officers then searched through text messages, contacts, and photos, asking extensive questions about what they found, including questions about his political views, any political organizations he belonged to, and whether he hated America or was part of "Antifa."[13] Another traveler recalled that after officers confiscated her phone and demanded her password, they reviewed videos on her phone, checked her Facebook page, and interrogated her for forty-five minutes about the mosque she attended, whether she knew any victims of the Quebec mosque attack that had taken place the week before, and her opinion of President Trump's policies.[14]

Search reports show that CBP and ICE officers not only reviewed the contents of travelers' devices during border encounters but also kept records of travelers' social media accounts. During one search, CBP officers recorded a traveler's

---

[13] *CRCL Complaint Intake Form (5/27/2018)*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/W7K3-2JQH.

[14] *CRCL Complaint Closure (07/11/2017)*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/2GDA-F7G6.

usernames on Instagram, Facebook, WhatsApp, Viber, Snapchat, YouTube, and Tango. The officers also made note of the traveler's answers to account security questions and his phone passcode.[15] Other reports document travelers' email addresses.[16]

Recent reporting underscores concerns that agents are using their authority to search electronic devices to chill dissent. In early 2025, a scientist was denied entry to the United States after border agents found messages critical of the Trump administration on his phone.[17] And in Michigan and Massachusetts, border agents have targeted attorneys involved in high-profile immigration cases for device searches, including one attorney who frequently criticized the government's immigration policies on social media.[18]

---

[15] *CBP Electronic Media Report (7/26/2017)*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/X5QF-V5CU.

[16] *E.g.*, *id.*; *CBP Electronic Media Report (9/03/2017)*, Knight First Amend. Inst. at Columbia Univ., https://perma.cc/KVJ9-7PXR.

[17] Robert Mackey, *French Scientist Denied US Entry After Phone Messages Critical of Trump Found*, The Guardian (Mar. 19, 2025), https://perma.cc/927T-SQRL.

[18] Johana Bhuiyan, *Pro-Palestinian protester's lawyer stopped and searched at US border: 'They were going to take my device'*, The Guardian (Apr. 12, 2025), https://perma.cc/8LBC-LWWW; Oscar Margain, *Immigration Attorney sues Trump administration after phone seized at Logan*, NBC10 Boston (Oct. 21, 2025), https://perma.cc/6YEP-7FXT.

None of these incidents involved forensic searches—that is, agents did not use external equipment to assist them. CBP and ICE policies therefore did not require agents to have any particular reason to search the devices in any of these incidents. Yet the searches imposed profound burdens on speech and association. When travelers know they can be subjected to searches touching on political, social, religious, or other expressive activity—activity that the First and Fourth Amendments were designed to protect from unreasonable government scrutiny— they are less likely to engage in that activity. Travelers will be fearful of exchanging messages about politics or religion, storing videos from their houses of worship, or documenting their election-related activities. They will be less inclined to engage in constitutionally protected activity within the United States because of the knowledge that their activities may be exposed when they cross the border.

**II.     The government's searches of Mr. Inofuentes's cell phones were unconstitutional.**

The district court's conclusion that border agents can manually search electronic devices without any quantum of individualized suspicion, J.A. 0618, cannot be squared with either First or Fourth Amendment protections. This Court has already recognized that cell phones, tablets, and laptop computers differ fundamentally from other objects in the scale and nature of expressive and private information they typically contain, and that, as a result, the burdens that device searches impose on expressive freedoms and individual privacy make these searches

11

unlike those that historically fell within the Fourth Amendment's border-search exception. *See Kolsuz*, 890 F.3d at 144–46. And the Court has emphasized that while there was a "convincing case" for treating at least forensic cell phone searches as non-routine even before the Supreme Court's decision in *Riley v. California*, that decision "confirmed every particular of that assessment." *Id.* (describing the "refusal to treat" cell phones "as just another form of container" as "the key to *Riley*'s reasoning"). As this Court considers how its reasoning in *Kolsuz*, *Aigbekaen*, and *Nkongho* applies to the manual searches of Mr. Inofuentes's phones, *Riley* remains central.

In *Riley v. California*, the Supreme Court applied the balancing framework it generally uses to "determine whether to exempt a given type of search from the warrant requirement"—"assessing, on the one hand, the degree to which [the type of search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." 573 U.S. at 385 (cleaned up). When *Riley* was decided, the search-incident-to-arrest exception permitted warrantless searches of personal items carried by the individual, such as a "cigarette pack, a wallet, or a purse," because the government interests underlying the exception—officer safety and evidence preservation—outweighed the "arrestee's reduced privacy interests upon being taken into police custody." *Id.* at 386, 391, 393. The Court concluded that this balancing yields a very different result

12

when it comes to searching cell phones. These searches constitute a profound invasion of an individual's privacy given the "vast quantities of personal information" that cell phones can contain, including "every piece of mail [owners] have received for the past several months, every picture they have taken, [and] every book or article they have read," as well as "picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on." *Id.* at 386, 393–94. The government had argued that a cell phone was "materially indistinguishable" from personal items like a wallet or a purse, but the Court rejected this logic, comparing it to "saying [that] a ride on horseback is materially indistinguishable from a flight to the moon." *Id.* at 392–93.

As *Riley* makes clear, even manual device searches necessarily sweep up a great deal of expressive and sensitive information, most—if not all—of which will be wholly unrelated to any legitimate government interest. Because of this, electronic device searches at the border that are not supported by probable cause are not narrowly tailored to a substantial government interest; they therefore fail any form of heightened scrutiny under the First Amendment. These searches are also unreasonable under the Fourth Amendment, because absent probable cause, the profound privacy interests at stake outweigh the general government interest in electronic device searches.

13

**A.** **Absent probable cause, searches of electronic devices at the border violate the First Amendment.**

**1.** **Searches of electronic devices at the border trigger First Amendment scrutiny.**

The First Amendment stands as an independent source of protection, separate and apart from the Fourth Amendment, against the search and seizure of devices at the border. *See Alasaad v. Mayorkas*, 988 F.3d 8, 22 (1st Cir. 2021) ("The First Amendment provides protections—independent of the Fourth Amendment—against the compelled disclosure of expressive information."); *Nieves v. Bartlett*, 587 U.S. 391, 414 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("[T]he *First* Amendment operates independently of the Fourth and provides different protections.").

The distinction between First and Fourth Amendment protections has been clear since the Supreme Court first articulated the border-search exception to the Fourth Amendment's warrant requirement in *United States v. Ramsey*, 431 U.S. 606 (1977). *Ramsey* involved a search of incoming international mail suspected to contain heroin. *Id.* at 609–10. After holding the search permissible under the Fourth Amendment, the Court separately considered the possibility that the search would chill free speech. The Court concluded that any chill would be "minimal" because the "[a]pplicable postal regulations flatly prohibit[ed], under all circumstances, the reading of correspondence absent a search warrant." *Id.* at 623–24. In other words,

14

the Court made clear that the inspection of expressive content at the border raises independent First Amendment concerns.

In this case, too, the First Amendment provides independent protection because searches of electronic devices necessarily implicate—indeed, they target—expressive activity. Nearly all information exposed to border agents while searching travelers' cell phones is expressive or associative. As the Supreme Court noted in *Riley*, cell phones are "minicomputers" that are much more than just phones; they "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." 573 U.S. at 393. They have an "immense storage capacity" that allows them to hold "millions of pages of text, thousands of pictures, or hundreds of videos." *Id*. at 393–94. In short, "[a]fter *Riley*, it is undeniable that the contents of a traveler's cell phone implicate core First Amendment activities." *United States v. Sultanov*, 742 F. Supp. 3d 258, 294 (E.D.N.Y. 2024).

### 2. Device searches not predicated on probable cause cannot survive any form of heightened scrutiny.

Electronic device searches not predicated on probable cause are unconstitutional under any form of heightened First Amendment scrutiny. The Supreme Court has long applied exacting scrutiny to the forced disclosure of personal beliefs and private associations. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021); *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6–7 (1971).

15

Anonymous writings, too, enjoy strong First Amendment protection. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347–48 (1995).[19]

Even under intermediate scrutiny, the government must show that manual device searches are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels of communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 796, 802 (1989); *see also Bonta*, 594 U.S. at 608–09 (explaining that narrow tailoring is "crucial where First Amendment activity is chilled," including where policies burden the freedom of association, "because First Amendment freedoms need breathing space to survive" (cleaned up)). It cannot do so here.

First, whatever weight this Court gives the government's asserted interests, *see infra* Part II.B.2, searches of electronic devices that are not supported by probable cause fail to satisfy the "narrow tailoring" requirement. In *Riley*, the Supreme Court rejected the government's contention that manual searches of cell phones incident to arrest were constitutional if officers had reasonable suspicion that they would uncover "information relevant to the crime, the arrestee's identity, or officer safety." 573 U.S. at 399. The Court explained that the reasonable suspicion

---

[19] First Amendment concerns with unmasking anonymous speakers are especially acute when those speakers are reporters' confidential sources, because their exposure threatens the ability of reporters to gather and report the news. *See Ashcraft*, 218 F.3d at 287; *Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C. Cir. 1981).

16

standard was not protective enough because devices searches "sweep in a great deal of information, and officers would not always be able to discern in advance what information would be found where." *Id.* Here, too, even if border agents searched devices only when they had a reasonable suspicion of a border-related offense, the searches "would sweep in a great deal of information" unrelated to that interest. *Id.*

In addition, the harm from the government's device searches extends far beyond those travelers whose devices are searched. The knowledge that the content of their devices may be searched without individualized suspicion, or even with a reasonable suspicion of wrongdoing, has a chilling effect. Travelers may refrain from using their devices for expressive and associational purposes for fear that their communications will be exposed. *See Sultanov*, 742 F. Supp. 3d at 294 (noting "the substantial risk that allowing warrantless searches of incoming travelers' electronic devices will unduly burden, chill, or otherwise infringe upon their First Amendment activities"); *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring) ("Awareness that the government may be watching chills associational and expressive freedoms."); *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 320 (1972) ("Official surveillance, whether its purpose be criminal investigation or ongoing intelligence gathering, risks infringement of constitutionally protected privacy of speech."). This chilling effect is exacerbated by the nearly unfettered authority that CBP's and ICE's policies give border agents to

17

decide whose devices to search and for what reason. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (referring to the "time-tested knowledge that in the area of free expression . . . placing unbridled discretion in the hands of a government official or agency . . . may result in censorship"). Unregulated electronic device searches thus threaten to chill the speech of everyone who crosses a U.S. border.

Second, these searches fail to "leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). In the modern world, there is no realistic alternative to the communication channels that electronic devices provide, whether a potential alternative is evaluated in terms of speed, scope, breadth of audience, or ability to communicate with otherwise remote persons. *See Riley*, 573 U.S. at 393. The government's claim that it may manually search the contents of literally every device crossing the border without any individualized suspicion leaves no realistic alternative for travelers or journalists hoping to safeguard the confidentiality of their communications. *See Kolsuz*, 890 F.3d at 145 (explaining that it is neither "realistic nor reasonable to expect the average traveler to leave his digital devices at home when traveling"). These searches are therefore entirely inconsistent with the requirements of the First Amendment.

18

While the First Circuit rejected a facial First Amendment challenge to the government's electronic device border search policies in *Alasaad v. Mayorkas*, its analysis was flawed. There, the court held that the government's policies had "a plainly legitimate sweep" and "serve[d] the government's paramount interests in protecting the border." *Alasaad*, 988 F.3d at 22. But the court relied on pre-*Riley* border search cases that employed reasoning rejected in *Riley*, failed to apply narrow tailoring, and ignored the fact that individualized suspicion would protect travelers' expressive interests without compromising the government's ability to search the devices when there is reason to do so.[20]

### B. Absent probable cause, searches of electronic devices at the border violate the Fourth Amendment.

The First Amendment, in addition to providing an independent basis for evaluating the constitutionality of the searches at issue, "imposes special constraints on searches for and seizures of presumptively protected material [] and requires that the Fourth Amendment be applied with 'scrupulous exactitude' in such

---

[20] The First Circuit's decision in *Alasaad* relied most heavily on a case from this Circuit, *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005), and one from the Ninth Circuit, *United States v. Arnold*, 533 F.3d 1003 (9th Cir. 2008). This Court has already explained that *Riley* may "call[] into question the permissibility of suspicionless manual searches" like the one in *Ickes. Kolsuz*, 890 F.3d at 146 n.5. And in *Arnold*, the Ninth Circuit reasoned that the search of a laptop is "logically [no] different from" the search of luggage and cannot be compared to the search of a home. 533 F.3d at 1009–10. In *Riley*, the Supreme Court flatly rejected the same arguments. 573 U.S. at 393, 396–97.

19

circumstances." *Maryland v. Macon*, 472 U.S. 463, 468 (1985) (quoting *Stanford*, 379 U.S. at 485); *see also Zurcher*, 436 U.S. at 564. As a court in this Circuit recently explained, the "scrupulous exactitude" requirement "applies with even greater force in today's technological landscape." *In re Search of the Real Prop. & Premises of Hannah Natanson*, No. 1:26-SW-00054 (WBP), 2026 WL 510727, at *8–9 (E.D. Va. Feb. 24, 2026), *aff'd*, No. 1:26-SW-00054 (WBP-AJT), 2026 WL 1458902 (E.D. Va. May 4, 2026). That should be the case here, because permitting border agents to intrude on First Amendment interests without judicial oversight would have grave consequences for the freedoms of speech, association, and the press.

Since the Founding, the Fourth Amendment's protections have been understood as safeguards for free expression and the free press in particular. The prohibition on unreasonable searches was widely understood as a response to abusive English practices targeting dissident publishers. *See Stanford*, 379 U.S. at 482; *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961) (explaining that the Fourth Amendment was written "against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression").

More recent cases, too, highlight the Court's special concern for searches that burden expressive activities. In *Carpenter v. United States*, the Court rejected the extension of the third-party doctrine to cell-site location records because of "the

20

seismic shifts in digital technology" that made possible "the exhaustive chronicle of location information casually collected by wireless carriers today," which could "provide[] an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." 585 U.S. 296, 311, 313–14 (2018) (cleaned up). And as noted above, the Court held in *Riley* that the search-incident-to-arrest exception did not extend to searches of cell phones, explaining that the quantitative and qualitative differences between electronic devices and other objects that might hold expressive content necessitate rethinking the application of analog-era constitutional doctrines in new technological circumstances. 573 U.S. at 393.

As the discussion below illustrates, careful application of the Fourth Amendment's balancing test in the context of manual electronic device searches at the border yields the same result as in *Kolsuz* and *Aigbekaen*. Before conducting a manual device search at the border, the Government must have "individualized suspicion of an offense that bears some nexus to the border search exception's purposes." *Aigbekaen*, 943 F.3d at 721. And while the Court has not yet defined how much "individualized suspicion" is required at the border, in light of the risk that the government's discretion could be abused to tread of First Amendment interests, it should require probable cause to suspect a border-related offense. *Cf. Sultanov*, 742 F. Supp. 3d at 296 (concluding that because electronic devices "hold such a vast

21

array of expressive content, only . . . probable cause and the approval of a neutral magistrate . . . can bear the weight of that obligation").

### 1. Manual searches of electronic devices at the border are profound intrusions upon personal privacy.

Searches of electronic devices at the border constitute an extraordinary intrusion into the privacy of journalists and other travelers. To be sure, travelers crossing our international borders generally have diminished privacy interests in their physical effects—in the items they carry in their baggage, purses, or pockets. But, as this Court recognized, electronic devices are fundamentally different from any other personal item that individuals may carry with them at the border. The "sheer quantity of data stored on smartphones," much of it "uniquely sensitive," "dwarfs the amount of personal information that can be carried over a border." *Kolsuz*, 890 F.3d at 145. And unlike "diaries, photographs, and other especially personal effects," it is not practical to expect travelers to avoid the risk of invasive searches by leaving electronic devices "at home." *Id.* (quotation marks omitted).

The harms identified in *Kolsuz* are not ameliorated when the search in question does not involve forensic analysis. After all, the searches in *Riley* were also manual, and yet, as the Supreme Court made clear, they could not permissibly be conducted without judicial supervision. "The only practical limitation on a manual search is a CBP officer's interest and zeal, and its potential scope is, in a word, breathtaking." *Sultanov*, 742 F. Supp. 3d at 289. A manual search may be "conducted

22

by any number of officers, for any amount of time, and include a review of any type of content on the phone, including content that is password protected or encrypted." *Id*. Here, for example, the searches of Mr. Inofuentes's cell phones spanned a period of over two hours and were conducted by three different officers. *See* J.A. 0432, J.A. 0467, J.A. 0514, J.A. 0523–0524. Because of the "potential scope" of the searches and the sensitivity of the information they could reveal, several district courts have determined that manual searches of electronic devices at the border are the type of invasive, non-routine searches that require individualized suspicion. *See, e.g.*, *Sultanov*, 742 F. Supp. 3d at 290–92 (requiring a warrant); *United States v. Alisigwe*, No. 1:22-cr-425 (VEC), 2023 WL 8275923, at *5 (S.D.N.Y. Nov. 30, 2023) (requiring reasonable suspicion), *appeal docketed*, No. 24-960 (2d Cir. Apr. 12, 2024).

> **2.    Granting border agents broad discretion to search electronic devices does not serve the government interests underlying the border-search exception.**

Like other narrow, carefully delineated exceptions to the warrant requirement, the border-search exception "should be defined by its justifications" and cannot be applied in a way that "would untether the rule from the justifications underlying it." *Aigbekaen*, 943 F.3d at 720 (cleaned up). Here, the Court has identified four interests at the border: "protecting territorial integrity and national security, blocking the entry

23

of unwanted persons and effects, regulating the collection of duties, and preventing the introduction of contraband." *Id*. (cleaned up).[21]

These interests do not support the "boundless" application of the border-search exception, *Aigbekaen*, 943 F.3d at 720, to suspicionless manual device searches. Just as the "generalized interest in law enforcement and combatting crime" is insufficient to support the application of the border-search exception to a forensic search, *Kolsuz*, 890 F.3d at 143, it is insufficient with regard to manual searches as well. Both manual and forensic searches allow the government to rummage through "vast quantities of uniquely sensitive and intimate personal information" on electronic devices, despite the fact that these devices "cannot contain many forms of contraband." *Aigbekaen*, 943 F.3d at 721.[22] This Court should reject an interpretation

---

[21] Other courts have concluded that the interests supporting the border-search exception should be more narrowly construed, distinguishing "between seizing goods at the border because their importation is prohibited and seizing goods at the border because they may be useful in prosecuting crimes." *United States v. Cano*, 934 F.3d 1002, 1018 (9th Cir. 2019) (citing *Boyd v. United States*, 116 U.S. 616, 622–23 (1886)).

[22] While one justification for searching electronic devices at the border is that those devices can contain contraband, such as child sexual abuse material, some courts have concluded that even this rationale is insufficient to justify application of the border-search exception. *See United States v. Smith*, 673 F. Supp. 3d 381, 394 (S.D.N.Y. 2023) (rejecting the justification because the discovery of that material likely does not prevent its entry into the United States, as it exists "not just on the phone device itself, but also on faraway computer servers potentially located within the country"), *appeal docketed*, No. 24-1680 (2d Cir. June 24, 2024); *Sultanov*, 742 F. Supp. 3d at 285 (similar).

of the Fourth Amendment that would allow manual searches of electronic devices to become untethered from the limited justifications for the border-search exception. *See United States v. Cano*, 934 F.3d 1002, 1007, 1019–20 (9th Cir. 2019) (holding that manual and forensic searches must both be limited in scope to fall within the border-search exception).

### 3. The balance of interests requires at least probable cause of a border-related offense when the government searches electronic devices at the border.

The balance of interests here is straightforward: Searches of electronic devices at the border are a profound intrusion upon the privacy and expressive rights of journalists and other travelers and do not meaningfully serve many of the interests that justify the border-search exception in the first place. That some travelers' devices might contain digital contraband or evidence of a border-related offense cannot justify granting the government unfettered authority to manually search the devices of every traveler entering or exiting the country. This Court has yet to decide what level of individualized suspicion would be enough to justify searching an electronic device at the border. *See Nkongho*, 107 F.4th at 382; *Aigbekaen*, 943 F.3d at 720 n.5. It should take this opportunity to clarify that for both manual and forensic device searches, probable cause of a border-related offense is required.[23]

---

[23] Amici believe that requiring a warrant would best protect travelers' First and Fourth Amendment rights. *See Smith*, 673 F. Supp. 3d at 396; *Sultanov*, 742 F. Supp.

This would be the most protective rule any circuit court has adopted so far, but it is the right one. A lower standard simply cannot be squared with the Supreme Court's application of the search-incident-to-arrest exception in *Riley* or the third-party doctrine in *Carpenter*. Circuit courts that have concluded otherwise emphasize "the fact that the searches are taking place at the border," *United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024) (quoting *Alasaad*, 988 F.3d at 18), while effectively ignoring the "seismic shifts in digital technology," *Carpenter*, 585 U.S. at 313, that make searches of electronic devices distinctly threatening to the expressive and privacy interests at stake. It is true, of course, that other types of non-routine border searches require only reasonable suspicion. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985). But physical searches—even invasive ones—are not equivalent to searching "every piece of mail [owners] have received for the past several months, every picture they have taken, [and] every book or article they have read," as well as "picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on." *Riley*, 573 U.S. at 386, 393–94; *see also Zurcher*, 436 U.S. at 564 (holding that the Fourth

---

3d at 291–96. Amici recognize controlling Circuit law indicating that a warrant is not required, even for forensic electronic device searches, *see Kolsuz*, 890 F.3d at 143; *Aigbekaen*, 943 F.3d at 720 n.5, and so do not press those arguments here.

26

Amendment must be applied with "scrupulous exactitude" in cases involving searches of expressive and associational materials).[24]

The Fourth Amendment balance tilts sharply in favor of protecting the expressive and privacy rights of travelers, as well as the newsgathering activities of journalists. Probable cause should be required before agents conduct an electronic device search, even if that search occurs at one of the nation's borders. "No less a standard could be faithful to First Amendment freedoms." *Stanford*, 379 U.S. at 485.

## Conclusion

For the foregoing reasons, the Court should hold that the government's searches of Mr. Inofuentes's cell phones violated the Constitution.

June 9, 2026                                  Respectfully submitted,

Bruce D. Brown                              /s/ Stephanie Krent
Gabriel Rottman                            Stephanie Krent
Grayson Clary                              Raya Koreh
Reporters Committee for Freedom of    Scott B. Wilkens
  the Press                                     Alex Abdo
1156 15th St. NW, Suite 1020          Jameel Jaffer
Washington, D.C. 20005                Knight First Amendment Institute at
(202) 795-9300                                Columbia University

---

[24] Tellingly, none of the cases setting a lower standard for border searches of electronic devices discuss *Zurcher*. *See Mendez*, 103 F.4th at 1307–10; *United States v. Castillo*, 70 F.4th 894, 897–98 (5th Cir. 2023); *Alasaad*, 988 F.3d at 16–18; *United States v. Xiang*, 67 F.4th 895, 899–900 (8th Cir. 2023); *Cano*, 934 F.3d at 1016, 1020; *United States v. Touset*, 890 F.3d 1227, 1233–34 (11th Cir. 2018).

475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

*Counsel for Amici Curiae*

28

**Certificate of Compliance**

This brief complies with the type-volume limit of the Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,457 words.

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: June 9, 2026                                   */s/* Stephanie Krent
                                                                 Stephanie Krent