IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 26-4150

UNITED STATES OF AMERICA,

*Appellee*,

v.

MICHAEL JAIME INOFUENTES,

*Appellant*.

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria

*The Honorable Patricia Tolliver Giles, District Judge*

BRIEF OF THE UNITED STATES

Todd W. Blanche
Acting Attorney General

Theophani K. Stamos
First Assistant United States Attorney

Lauren Halper
Laura D. Withers
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Attorneys for the United States of America*

**Table of Contents**

**Page**

Table of Authorities ......................................................................................... iii

Introduction .......................................................................................................1

Issues Presented .................................................................................................4

Statement of the Case .........................................................................................5

    A.     Inofuentes travels to Colombia and solicits MV1, a homeless, drug-addicted minor girl, for commercial sex .......................................5

    B.     Federal agents conduct a manual border inspection of Inofuentes's cell phone, and Inofuentes agrees to an interview. ..........9

    C.     Inofuentes is arrested on charges related to commercial sex trafficking. ...................................................................................12

    D.     The district court denies Inofuentes's motions to suppress his statements and the manual border inspection of his cell phone. ..........13

    E.     The parties propose jury instructions and a special verdict form, and Inofuentes fails to request a specific unanimity instruction. .........16

    F.     A jury finds Inofuentes guilty at trial. ................................................17

Summary of Argument .....................................................................................19

Argument ..........................................................................................................20

I.     The district court did not abuse its discretion in admitting MV1's voice note at trial. ...........................................................................20

    A.     The voice note was not hearsay because it was offered to show its effect on Inofuentes, not for its truth. ............................................21

B.      The voice note was not hearsay because it was an adoptive admission. ...................................................................25

C.      In any case, any error in admitting the voice note was harmless. ........27

II.     The district court properly instructed the jury. ...............................................30

A.      Inofuentes waived the argument that the jury had to be unanimous as to the date of each offense. ...........................................30

B.      Alternatively, the district court did not plainly err in instructing the jury on Counts 1 and 2. ...............................................34

1.    The district court did not err. ......................................................35
2.    Any error is not plain. ..................................................................37
3.    Any plain error did not affect Inofuentes's substantial rights. ......38
4.    The Court should decline to notice any plain error. ......................39

III.    The district court properly denied Inofuentes's motion to suppress his statements to agents at Miami International Airport. ...................................41

A.      Inofuentes's statements to law enforcement were voluntary. .............41

B.      Alternatively, any error in admitting Inofuentes's statements was harmless. ...................................................................49

IV.     The district court properly denied Inofuentes' motion to suppress the manual border inspection of his cell phone. ...................................................50

Conclusion ...........................................................................................................53

Statement Regarding Oral Argument ...................................................................54

Certificate of Compliance ...................................................................................55

ii

**Table of Authorities**

**Page**

**Cases**

*Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021) ..................................................51

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ......................................................49

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ......................................................42

*Commonwealth v. Conefrey*, 650 N.E.2d 1268 (Mass. 1995) ...............................38

*Correll v. Thompson*, 63 F.3d 1279 (4th Cir. 1995) ..........................................49

*Gibbons v. Gibbs*, 99 F.4th 211 (4th Cir. 2024) ................................................52

*Greer v. United States*, 593 U.S. 503 (2021) .................................................. 35, 39

*Hutto v. Ross,* 429 U.S. 28 (1976) ...................................................................47

*Illinois v. Perkins*, 496 U.S. 292 (1990) ............................................................42

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (en banc) ....................52

*Miller v. State*, 16 P.3d 937 (Idaho Ct. App. 2000) .............................................38

*Minnesota v. Murphy*, 465 U.S. 420 (1984) ......................................................47

*Rivers v. United States*, 400 F.2d 935 (5th Cir. 1968) .........................................45

*Simmons v. Bowersox*, 235 F.3d 1124 (8th Cir. 2001) .........................................45

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) ......................................41

*United States v. Allen*, 603 F.3d 1202 (10th Cir. 2010) .................................. 38-39

*United States v. Anguiano*, 873 F.2d 1314 (9th Cir. 1989) ............................... 36-37

*United States v. Belmonte Cardozo*, 181 F.4th 461 (4th Cir. 2026) ........ 3, 20, 51-52

*United States v. Bermea-Boone*, 563 F.3d 621 (7th Cir. 2009) ............................25

*United States v. Blauvelt*, 638 F.3d 281 (4th Cir. 2011) ......................................50

*United States v. Braxton*, 112 F.3d 777 (4th Cir. 1997) (en banc) ........ 41, 43, 45-46

*United States v. Brown*, 765 F. App'x 902 (4th Cir. 2019) (per curiam) .......... 29-30

*United States v. Camara*, 908 F.3d 41 (4th Cir. 2018) ........................................35

*United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019) ........................................51

*United States v. Carthorne*, 726 F.3d 503 (4th Cir. 2013) .............................. 37-38

*United States v. Castillo*, 70 F.4th 894 (5th Cir. 2023) ..............................51

*United States v. Cedelle*, 89 F.3d 181 (4th Cir. 1996)...............................40

*United States v. Coley*, 447 F. App'x 501

　(4th Cir. 2011) (unpublished) ...................................................22

*United States v. Cooper,* 482 F.3d 658 (4th Cir. 2007)...........................21

*United States v. Cunningham,* 761 F. App'x 203 (4th Cir. 2019) ...........................21

*United States v. Elsheikh*, 103 F.4th 1006 (4th Cir. 2024) ......................... 21, 41, 50

*United States v. Everett*, 91 F.4th 698 (4th Cir. 2024) ...............................5

*United States v. Farris*, No. 23-7009, 2023 WL 8752903

　(10th Cir. Dec. 19, 2023)...................................................39

*United States v. Ferguson*, 140 F.4th 538 (4th Cir. 2025)................................ 22, 27

*United States v. Gallagher*, 90 F.4th 182 (4th Cir. 2024) ................................ 22-23

*United States v. Giddins*, 858 F.3d 870 (4th Cir. 2017) ...........................42

*United States v. Guerrero-Damian*, 241 F. App'x 171 (4th Cir. 2007) ..................25

*United States v. Hale*, 857 F.3d 158 (4th Cir. 2017) ................................33

*United States v. Hardy*, 999 F.3d 250 (4th Cir. 2021)...............................38

*United States v. Heater*, 63 F.3d 311 (4th Cir. 1995)................................21

*United States v. Holmes*, 670 F.3d 586 (4th Cir. 2012)............................47

*United States v. Ivey*, 60 F.4th 99 (4th Cir. 2023) ........................... 31, 34

*United States v. Jeffers,* 570 F.3d 557 (4th Cir.2009) ...............................40

*United States v. Jenkins*, 579 F.2d 840 (4th Cir. 1978)............................22

*United States v. Jinadu,* 98 F.3d 239 (6th Cir.1996) ...............................26

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010)............................27

*United States v. Keeter*, 130 F.3d 297 (7th Cir. 1997) ............................31

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) ............................51

*United States v. Louis*, 233 F. Appx. 933 (11th Cir. 2007) ................................25

*United States v. Lynn*, 592 F.3d 572 (4th Cir. 2010)................................35

*United States v. Maxwell*, 285 F.3d 336 (4th Cir. 2002) ...........................38

*United States v. Mendez*, 103 F.4th 1303 (7th Cir. 2024) .........................52

v

*United States v. Miller*, 41 F.4th 302 (4th Cir. 2022)........................................ 35-37

*United States v. Naughton*, 621 F. App'x 170 (4th Cir. 2015)..............................29

*United States v. Naum*, 134 F.4th 234 (4th Cir. 2025) ......................................34

*United States v. Nicolau*, 180 F.3d 565 (4th Cir. 1999) ....................................34

*United States v. Olano*, 507 U.S. 725 (1993) .................................................. passim

*United States v. Payseno,* 782 F.2d 832 (9th Cir. 1986) ........................................36

*United States v. Pelton*, 835 F.2d 1067 (4th Cir. 1987)...........................................44

*United States v. Purks*, 139 F.4th 388 (4th Cir. 2025)........................................ 41-42

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997)..........................................21

*United States v. Rawle*, 845 F.2d 1244 (4th Cir. 1988)..........................................21

*United States v. Recio*, 884 F.3d 230 (4th Cir. 2018)...........................................27

*United States v. Reid*, 523 F.3d 310 (4th Cir. 2008)...........................................40

*United States v. Roach*, 28 F.3d 1212 (4th Cir. 1994) (unpublished) ............... 36-37

*United States v. Robinson*, 275 F.3d 371 (4th Cir. 2001)................................. 25-26

*United States v. Robinson,* 404 F.3d 850 (4th Cir. 2005).........................................49

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010)...........................................40

*United States v. Robinson*, 744 F.3d 293 (4th Cir. 2014)................................ 31, 33

*United States v. Rodriguez*, 311 F.3d 435 (1st Cir. 2002)......................................31

*United States v. Simmons*, 11 F.4th 239 (4th Cir. 2021) ......................................22

*United States v. Tolliver*, 454 F.3d 660 (7th Cir. 2006) ......................................22

*United States v. Torcasio,* 959 F.2d 503 (4th Cir. 1992), *abrogated on
other grounds by Evans v. United States*, 504 U.S. 255 (1992)...................36

*United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018) ......................................52

*United States v. Williams*, 41 F.3d 192 (4th Cir. 1994).........................................29

*United States v. Wolf*, 813 F.2d 970 (9th Cir. 1987) ...............................................45

*United States v. Xiang*, 67 F.4th 895 (8th Cir. 2023) ............................................52

*Withrow v. Williams*, 507 U.S. 680 (1993).........................................................42

*Wood v. Milyard*, 566 U.S. 463 (2012)..............................................................33

**Statutes**

18 U.S.C. § 1001 ................................................................45

18 U.S.C. § 1591 ......................................................... 13, 38

18 U.S.C. § 1594(a) ...........................................................13

18 U.S.C. § 1596(a) ...........................................................13

18 U.S.C. § 2423 ......................................................... 13, 38

**Other Authorities**

2 McCormick on Evid. § 249 (8th ed.) (McCormick) ................................23

**Rules**

Fed. R. Crim. P. 12(b)(3)(B)................................................31

Fed. R. Crim. P. 30(d) ........................................................34

Fed. R. Crim. P. 52.......................................................... 21, 27

Fed. R. Evid. 801 .......................................................... 21, 25

Fed. R. Evid. 802 ..............................................................21

**Introduction**

In 2024, Michael Jaime Inofuentes, a 44-year-old U.S. citizen, made 14 trips from the United States to Medellin, Colombia, where he repeatedly solicited and paid a homeless, drug-addicted, 15-year-old girl ("MV1") for sex. Inofuentes committed his crimes knowing – and capitalizing on the fact – that MV1 was young, isolated from her family, and dependent on sex work to eat and keep a roof over her head.

That same year, Homeland Security Investigations (HSI) launched an investigation into U.S. persons who traveled to Medellin to have sex with children (i.e., child sex tourism). As part of this investigation, HSI-Miami Special Agent Miranda Ballard obtained records from Western Union related to an individual suspected of involvement in child sex trafficking in Medellin. Ballard's review of those records revealed five separate payments in October 2023 from Inofuentes to this individual, consistent with the amount of a finder's fee to a child sex trafficking recruiter in Colombia.

In November 2024, Inofuentes flew from Colombia to Miami International Airport (MIA), where he was referred to secondary inspection. Ballard and two officers with Customs and Border Protection (CBP) conducted a manual border search of Inofuentes's cell phone, which revealed a March 26, 2024, WhatsApp conversation between Inofuentes and MV1 that appeared to relate to commercial

1

sex. Inofuentes also waived his *Miranda* rights and agreed to an interview with law enforcement. During the interview, Inofuentes made numerous contradictory statements, including initially admitting to a sexual relationship with MV1, then later denying that they had sex.

Inofuentes later attempted to board a flight at Washington Dulles International Airport ("Dulles") bound for Colombia. Officers stopped him on the jetway, and Inofuentes again agreed to an interview with law enforcement. At first, Inofuentes lied about his relationship with MV1, claiming that despite the fact that MV1 was pregnant, and he might be the father of her baby, they had never had sex. Eventually, Inofuentes admitted that he knew MV1 was engaged in sex work, and on the night of March 26, 2024, he offered her money to go and have sex with him at a hotel. Inofuentes also admitted that he was sexually attracted to minor girls and that his abuse and exploitation of young girls in Colombia was simply a matter of "convenience or circumstances," and that, though he is "old now," "these people who are available are young." At the conclusion of the interview, he was placed under arrest.

A federal grand jury charged Inofuentes with engaging in commercial sex in a foreign country and child sex trafficking. After a four-day trial, a jury convicted him of both counts.

2

Inofuentes raises four arguments on appeal. First, he contends that the district court erred in admitting a voice note MV1 sent to Inofuentes on March 26, 2024, while he relentlessly begged MV1 to meet him for sex. The district court correctly overruled the objection, as the voice note was not offered for its truth and thus was not hearsay.

Second, Inofuentes contends that the district court erred by failing to provide a unanimity instruction, requiring the jury be unanimous that he committed each charged offense on at least one specific occasion during the nine-month period charged in the superseding indictment. Inofuentes waived the issue and, in any event, cannot demonstrate any plain error because he has failed to cite any binding precedent requiring a specific unanimity instruction for offenses charged in a nine-month date range.

Third, Inofuentes argues that the district court erred in denying his motion to suppress his statements during his Miami interview, claiming they were involuntary. However, a careful review of Inofuentes's recorded interview reveals no evidence of any coercive police action that would have overborne Inofuentes's will and rendered his statements involuntary.

Finally, Inofuentes's fourth argument related to the manual border inspection of his cell phone is now squarely foreclosed by this Court's recent decision in *United States v. Belmonte Cardozo*, 181 F.4th 461 (4th Cir. 2026).

3

Because none of these claims has merit, the Court should affirm Inofuentes's convictions.

## Issues Presented

1.     Did the district court abuse its discretion when it admitted into evidence a non-hearsay voice note sent by MV1 to Inofuentes during a text conversation in which Inofuentes offered her money to meet at a hotel for sex?

2.     Did Inofuentes waive the argument that the district court should have given a specific unanimity instruction requiring the jury to unanimously find that Inofuentes engaged in the charged offenses on a specific date within the date range alleged in the superseding indictment?  Alternatively, did the district court plainly err in failing to give a specific unanimity instruction?

3.     Did the district court properly deny Inofuentes's motion to suppress his post-*Miranda* statements to law enforcement at MIA based on its determination that the statements were voluntary?

4.     Did the district court properly deny Inofuentes's motion to suppress the evidence recovered from the manual border inspection of his cell phone because no reasonable suspicion was required?

4

## Statement of the Case

The following facts are recounted "in the light most favorable to the Government, as the prevailing party in the jury and suppression proceedings." *United States v. Everett*, 91 F.4th 698, 703 n.1 (4th Cir. 2024).

### A. Inofuentes travels to Colombia and solicits MV1, a homeless, drug-addicted minor girl, for commercial sex.

In early 2024, Inofuentes met MV1, then 15, while traveling in Medellin. *See* JA2369, JA0878, JA2144-2145, JA2093-2094. MV1 was homeless and drug-addicted at the time, and bounced between hotels in the city, which she paid for by engaging in sex work. *See* JA1879, JA1918, JA1925-1927. The first night that Inofuentes met MV1, he took her to his apartment and had sex with her. JA2144-2148. After that first encounter, Inofuentes solicited and paid MV1 for sex on at least three more occasions between March 2024 and April 2024. *See, e.g.*, JA1949-1964, JA2390 (March 26-27, 2024); JA1864-1865, JA1878-1905, JA1907-1908 (March 4, 2024); JA1934-1938, JA1966-1967 (April 1, 2024).

From the very beginning of his association with MV1, Inofuentes knew four things about her: (i) she was a minor; (ii) she was homeless and destitute; (iii) she was addicted to drugs; and (iv) she was a sex worker. *See, e.g.,* JA1922, JA1923-24, JA1928-30, JA1931, JA2363, JA2364, JA2366, JA1077-1078, JA1151-1153, JA1169, JA1246, JA1252, JA1173, JA1225, JA1229, JA1230, JA1770-71, JA1294-1295, JA1234-1238, JA1274, JA1287, JA1304-1306, JA1257-1258.

Indeed, Inofuentes had numerous conversations with MV1 about her involvement in sex work and her exceedingly difficult life in Medellin as a young girl without a support system or any other means for survival. Between February 2024 and April 2024, MV1 sent Inofuentes the following messages, underscoring her dire living situation:

- "you know that I have to work because you haven't paid for my room nor have I eaten all day" "So what do you want me to do I have to work." JA1252-1253.

- "They're asking me what I'm going to do otherwise they'll kick me out of the hotel" "What are we going to do." JA1125.

- "I'm hungry I haven't eaten I ate yesterday): and that's it." JA1151.

- "And over here they've also started hassling about the payment for the room." JA1152.

- "I don't know what to do" "I think they're going to kick me out of the room." JA1153.

- "They're going to kick me out" "If I don't pay I have to pack" "I'll be on the street" (to this, Inofuentes replied, "What part of the street[?]") JA1169.

- "I haven't even paid for the room" "I don't know what to do" JA1246.

- "I feel lonely" "I don't have friends" "They are there only when I have money" "Otherwise I am alone" "That hurts" JA1229-1230.

- "I'm going to kill myself" "I can't stand this anymore" (to which Inofuentes responded, "But have an ice cream") "I don't have money I don't have anything" "I'm alone" "They've all left me alone" JA1770-1771.

6

- "I was robbed" "They hit me" "They robbed me of what I had for the room and food and I know they stole the other cell" "I want to die" JA1235-1236.

- "I'm going to get dressed up" "I don't have any other work and I'm hungry and I have to pay for the room." JA1759.

For MV1, "work" only ever meant sex work. JA886, JA2155.

Between February 2024 and March 2024, MV1 sent Inofuentes the following messages about her drug addiction:

- "I only have sex with you" "And I won't huff glue anymore I swear" JA1172.

- On March 5, 2024, in response to Inofuentes's question about where she was before calling him, MV1 said, "Huffing glue on the street." JA1225.

- "I'm going to get dressed in a bit to see if I go out to distract myself and buy some pills for anxiety." JA1298.

On the evening of March 3, 2024, MV1 told Inofuentes she would not "work" "[u]ntil you come." JA1173. Later that night, just a few hours after MV1 told Inofuentes she had not eaten since the day before and was at risk of being kicked out of her hotel room, Inofuentes told her, "Sleep with me this last night at 1am" "I leave for the airport at 9am[.]" JA1151-1153, JA1183. MV1 agreed she would and asked where they should meet. JA1183. Inofuentes said he was "at the other hotel[.]" JA1192. The following morning, just before 1 a.m., Inofuentes sent MV1 proof of a money transfer for 80,000 Colombian pesos (approximately $20). JA1194-1195. Two weeks later, Inofuentes asked MV1, "Are you pregnant or did you get your

7

period already?"  JA1541.  MV1 said, "Oofff it came a while back and it's even over[.]"  JA1542.  Inofuentes replied, "Mm ok" "Thank God[.]"  JA1542.

On April 1, 2024, a few minutes after MV1 told Inofuentes she had to go work because she was hungry and needed money to pay for her room, Inofuentes again solicited MV1 for commercial sex.  *See* JA1932-1933.  Inofuentes asked MV1 what hotel she could use for "work" in Botero.  JA1935.  MV1 said she could use the hotel where she was staying.  JA1936.  Inofuentes replied, "Let's work you and I[.]"  JA1936.  Approximately two weeks later, on April 19, 2024, Inofuentes asked MV1, "Are you pregnant??"  JA1966.  MV1 said no, and then Inofuentes told her "I'll give you a baby[.] Mine[.]"  JA1966.

On March 26-27, 2024, Inofuentes – knowing MV1 was engaged in sex work that night – solicited MV1 to meet him at a hotel for sex in exchange for approximately $20.  *See* JA1702-JA1714.  Inofuentes told MV1 he was "Talking to people" in San Diego, "But I want you[.]"  JA1703.  Then he said, "Work with me" "I have money[.]"  JA1704.  MV1 asked him, "So how much will you give me[?]"  JA1704.  He told her he would pay her the "Regular" price and enticed her to "go to a nice place" with a "[s]auna."  JA1705-1706.  MV1 said she did not want to go to a nice place, so Inofuentes suggested "here in San Diego" "There's a hotel."  JA1708.  MV1 said again, "tell me how much you'll give me talk to me straight[.]"  JA1709.  Inofuentes said, "For fucking" and then, "Ask" "80,000 too little[.]"

8

JA1709. MV1 said, "Obviously that's way too little" and Inofuentes responded, "Do you charge me more than some other man? You shouldn't charge so little[.]" JA1709-1710.

Inofuentes continued to beg MV1 to meet him and attempted to negotiate the price of sex with MV1. JA1710-1711. As they went back and forth, MV1 sent him a voice note telling him:

> Michael [PH], look, when we met you know that I did not charge you cheaply. Sorry about that. And if you're expecting that because she told you at 80 I will go with you, no, you are very mistaken in life. And now, now I'm off to San Diego. Don't talk to me when you see me, I don't want you to talk to me because I'm going to be working, don't look for me at all. You didn't want to go with me and my girlfriends, fine, no big deal. Fine, but I hope and expect that you won't be looking for me in San Diego. Thank you.

JA1711; JA1850-JA1851.

After he received her voice note, Inofuentes told MV1, "I was going to give you 200,000 for the time but 300,000 is fine." JA1713. MV1 replied, "Then we'll see each other in San Diego to go to a hotel[.]" JA1713. Inofuentes said, "Well yes" "Unless you prefer some other crazy depraved man from around San Diego." JA1713.

## B. Federal agents conduct a manual border inspection of Inofuentes's cell phone, and Inofuentes agrees to an interview.

On November 1, 2024, HSI Special Agent Miranda Ballard learned that Inofuentes was scheduled to fly from Colombia to MIA later that day. Ballard

notified CBP of his pending arrival and requested assistance for a border search of Inofuentes's electronics. JA737, JA773-774. When Inofuentes arrived in Miami, he went through customs and was taken for a secondary border inspection. JA426, JA574. During that inspection, CBP located, among other things, an iPhone to which Inofuentes provided the passcode. JA427, JA737.

CBP and HSI manually inspected Inofuentes's iPhone and, within minutes, found the March 26-27, 2024, WhatsApp chats between Inofuentes and MV1. JA428-430, JA0432. The chats, which Ballard found after searching the Spanish words for "minor" and "age," appeared to relate to commercial sex with MV1. JA428-430; JA221-228. All told, Ballard spent approximately 30 minutes conducting her manual border inspection of Inofuentes's cell phone. JA432.

Ballard then sought to interview Inofuentes in a room connected to the secondary inspection area. JA433-36. The entire interview of Inofuentes was recorded. *See* JA2393. Ballard provided Inofuentes with his *Miranda* warnings, which he waived. JA438-439, JA0339.

During the interview, Inofuentes repeatedly lied about his connections to Colombia and the nature of his relationship with MV1. For example, law enforcement asked Inofuentes about the entry for MV1 in his phone, which he had entered as "[name] 2024." JA294. Inofuentes replied, "I wrote 2024 because I'm looking for something to identify them. That would be the mother of the children."

10

JA294. The agent clarified, "the mother?" and Inofuentes replied, "my two children." JA294. This was a lie, and Inofuentes later admitted that this contact was MV1. JA295. Law enforcement showed Inofuentes a picture of MV1 and asked who she was. JA295. Inofuentes stated her name and said she was 17, but he had "nothing romantic with this girl." JA295. Inofuentes described MV1 as a "friend" and a "flirtatious thing," but not someone with whom he associated. JA295. He also said he had met MV1 only twice before. JA295. When asked if MV1 was involved in prostitution, Inofuentes stated, "not that I know of." JA351.

Ultimately, Inofuentes admitted that he had sex with MV1, and she was pregnant. JA300, JA351. He also admitted during this interview that he had sex with other minor girls while in Colombia, including the mother of his two children there. *See* JA2393 (Inofuentes's Recorded Interview) "241101_0002.WMA," at 39:00 – 42:51, 50:33 – 52:16. When asked if he had a preference for younger girls, Inofuentes told the agents:

> Okay, I thought a lot about this, honestly, and the long answer is no, but kind of yes. Okay, let me tell you. All my life I never wanted to be with a girl who's younger than me. I've always been around that. After getting divorced and this pattern that you've recognized, it's just because of, I guess, convenience or circumstances. So I'm old now and these people who are available are young.

SA100.

At the conclusion of the interview, Inofuentes left MIA and returned to Virginia. JA766.

11

### C. Inofuentes is arrested on charges related to commercial sex trafficking.

On November 4, 2024, Inofuentes attempted to board a flight from Washington Dulles International Airport, in the Eastern District of Virginia, to Colombia. JA873, JA946. Agents stopped him on the jetway and took him to a secondary inspection area for an interview. JA946.

During the interview, which was audio-recorded, Inofuentes again lied about his relationship with MV1. He told the agents that they had not had sex. *See* SA119. He later admitted the following about his March 26-27, 2024, solicitation of MV1:

- He was considering meeting up with MV1 and was offering to give her money for sex. "It is – it would be for like sex." JA2390.

- INOFUENTES: "Yes, that's what the idea is here. To pay for sex. I was just kind of like joshing with her. Yes, that's the intent, yes. That's what was happening there, yes . . . that is what we were talking about, if you want to be precise." JA2390.

- INOFUENTES: "Is she a prostitute? It seems to me that she has worked as a prostitute." JA2390.

- INOFUENTES: "At this point in time, I'm offering her money to go to have sex with her at a hotel." JA2390.

Inofuentes also admitted that he was "attracted, physically attracted to the appearance of . . . But not . . . of underage women." SA120. He stated that this (having sex with minors) is not his objective though he conceded it is "obviously the result." SA120. Inofuentes was then placed under arrest.

12

A federal grand jury later returned a superseding indictment charging Inofuentes with two counts.  Count One alleged that, "[b]etween on or about February 26, 2024, and on or about November 1, 2024," Inofuentes "attempted to and did knowingly recruit, entice, harbor, transport, obtain, maintain, patronize, and solicit by any means a minor," knowing that the minor "would be caused to engage in a commercial sex act," in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c); 1594(a); 1596(a)(1) and (a)(2).  JA154.  Count Two alleged that, "[b]etween on or about February 26, 2024, and on or about November 1, 2024," Inofuentes "traveled in foreign commerce from the United States to Colombia" and "engaged, and attempted to engage, in illicit sexual conduct with a person under 18 years of age," in violation of 18 U.S.C. § 2423(c),(f), and (g)(2).  JA155.

## D. The district court denies Inofuentes's motions to suppress his statements and the manual border inspection of his cell phone.

Before trial, Inofuentes moved to suppress the evidence recovered from the manual border inspection of his cell phone, arguing that the border search required reasonable suspicion of a transnational crime.  JA86-148.  Inofuentes also moved to suppress his statements to law enforcement in Miami.  *See* JA253-304.  He argued that his *Miranda* waiver and subsequent statements during his interview on November 1, 2024, were involuntary because, among other things, the agents promised him he would not get in trouble if he answered their questions.  The

13

government opposed both motions, arguing that the border search was lawful, JA158-229, and Inofuentes's *Miranda* waiver and statements were voluntary and not the product of police coercion, JA307-338.

In August 2025, the district court held a hearing on Inofuentes's suppression motions. The government called Special Agent Ballard, who testified that, in 2024, she had been investigating U.S. persons who traveled to Medellin for child sex tourism. JA410-417. She also testified about how she came to learn about Inofuentes through Western Union records, and her subsequent manual border inspection of his cell phone. JA418-421. The defense called CBP Officers Fernanda De Oliviera and Stephen Vargas, both of whom testified about the interview of Inofuentes. JA562, JA572.

After hearing evidence and argument, the district court denied Inofuentes's motions. First, the court denied the motion to suppress the evidence recovered from the border search of his cell phone. The court found that Ballard had conducted a routine, manual search of Inofuentes's cell phone. JA615-618. The court further found that "at no time was there an extraction or an analysis of the phone that involved a computer software that is analyzed or that is intended to analyze a hard drive. That did not take place." JA616. The court found that because the search was routine, no reasonable suspicion was required. JA618. Even so, the court found that if reasonable suspicion were required, the agents had it, based on Inofuentes's

14

payments to the Colombian individual and his recent and frequent travel to a country and city at high risk for child sex trafficking. JA618.

The district court also denied Inofuentes's motion to suppress his statements to law enforcement. The court found that Inofuentes was 44 years old, educated, and employed. JA640. The court found that there was "nothing, in terms of his background, that would suggest that he was somehow unable to intelligently, knowingly waive [his] rights." JA640. And, while "he doesn't have any lengthy criminal history" he does have "a prior arrest[.]" JA640. The court noted that "after the interview had specifically turned to the issue of child exploitation, Mr. Inofuentes said explicitly, 'I could say I plead the Fifth,' but then he continues on answering more questions. So, he is someone who fully understood his rights, his ability to waive them, and the fact that he could still invoke it, but he decided not to." JA644. The court then found that Inofuentes made a knowing, intelligent, and voluntary waiver of his *Miranda* warnings. JA639-640.

The court further found that Inofuentes's interview was voluntary and not the product of police coercion. Specifically, the court found that law enforcement had not made any "promises or threats, promises of leniency that the Fourth Circuit has found to have led to involuntary statements." JA643. In reaching this conclusion, the court considered the totality of the circumstances, including "the defendant's individual characteristics and background, the setting in which the statement

15

occurred and then the details of the interrogation." JA643. The court also noted that the interview began "very informal and relaxed" and while at "certain portions the questioning became more pointed" it "was not to the point that it would overcome any kind of free will on [Inofuentes's] part." JA643-644.

### E. The parties propose jury instructions and a special verdict form, and Inofuentes fails to request a specific unanimity instruction.

In September 2025, the government filed the parties' proposed joint jury instructions, SA1-57, as well as six disputed instructions it proposed to offer, JA649-656. That same day, Inofuentes filed his own version of the six disputed instructions, SA58-66, and a memorandum, objecting to aspects of the government's proposed instructions 26, 31, 34, 37, 40, and 43, JA657-665, and requesting to instruct the jury on the age of consent in Colombia, JA660-663. Inofuentes did not propose an instruction requiring the jury to be unanimous as to a specific date within the charged date range on which the offenses were committed.

Inofuentes also filed a proposed verdict form. SA67-70. His proposed verdict form did not require the jury to unanimously find Inofuentes had committed the offenses on a specific date within the date range alleged in the superseding indictment.

On the day before trial was scheduled to begin, Inofuentes claimed for the first time during a pretrial conference that there was a "major problem with the duplicity

16

in the indictment, and it's going to have to be cured through jury instructions."
JA668. He then argued that the court should instruct the jury that it must be
unanimous as to the specific date that he allegedly committed this offense. JA669.
The pretrial motions date having long since passed, the court instructed Inofuentes
that "if [he had] something to file, [he should] file it." JA671. Inofuentes did not
move to dismiss either count as duplicitous, nor did he propose a specific unanimity
instruction. And he ultimately agreed to the special verdict form, which did not
contain a specific unanimity finding. JA2196.

### F. A jury finds Inofuentes guilty at trial.

On September 9, 2025, the case proceeded to trial. In its case-in-chief, the
government called a Spanish-English translator, as well as Special Agents Ballard
and Fisher. Among other evidence, the government admitted the WhatsApp chats
between Inofuentes and MV1 (JA1035-1795, JA1796-1849, JA0877), obscene
photos of MV1 recovered from Inofuentes's cell phone (JA903-907), and two voice
notes MV1 sent to Inofuentes during their WhatsApp exchanges (JA1850-1853).
The evidence admitted at trial established that on three separate dates between March
2024 and April 2024, including March 3-4, 2024, March 26-27, 2024, and April 1,
2024, Inofuentes solicited and paid MV1 for sex.

Inofuentes testified in his defense and admitted what was already clear from
his WhatsApp messages: he knew MV1 was a minor and he knew shortly after

17

meeting her that she was engaged in sex work.  JA2086-2087, JA2152-2153; *see also* JA1852-1853.  In fact, Inofuentes admitted he knew within a week of meeting MV1 that she "had worked for sex, yes, and that she will be needing to work for sex because she needed money."  JA2154.  Inofuentes also testified that when he and MV1 discussed her "work" they were referring to prostitution.  JA2155, JA2158, JA2171, JA2173-2174.

Inofuentes testified about his first meeting with MV1 on February 25, 2024, the one to which she alluded in her voice note.  *See* JA1850-1851, JA2094.  Inofuentes said the first time he saw MV1 she was on the street.  JA2094.  He thought she was attractive and stopped to talk to her.  JA2094.  He took her to a restaurant and then to his apartment where they had sex.  JA2095-2097.  Afterward, he dropped MV1 off at her home, which he described as "a slum."  JA2151.

Inofuentes claimed that sex work was what MV1 wanted to do.  JA2191.  He asserted that MV1 received money from her parents, despite there being no evidence of this, yet she still engaged in sex work because "she wanted to go out with her friends" and "she wanted to impress [them]."  JA2190-2191.  He also testified that his relationship with MV1 was "good" "absolutely."  JA2208.  Then, regarding his two law enforcement interviews, Inofuentes admitted that he had lied to Ballard and Fisher at various points.  JA2211.

18

After deliberation, the jury found Inofuentes guilty of child sex trafficking and engaging in illicit sexual conduct in a foreign place. In February 2026, the district court sentenced him to 220 months' imprisonment. JA35.

This appeal followed.

## Summary of Argument

Inofuentes raises four challenges to his convictions, none of which has merit. Therefore, the Court should affirm.

**1**.     The district court did not abuse its discretion in admitting a voice note MV1 sent to Inofuentes during their WhatsApp chats. The voice note was not offered for the truth of the matter asserted and, alternatively, was admissible as an adoptive admission. In any event, any error in admitting the voice note was harmless.

**2.**     Inofuentes waived his argument that the district court should have given a specific unanimity instruction by identifying a duplicity issue on the eve of trial and then failing to propose a specific unanimity instruction. In any event, Inofuentes cannot meet his burden of demonstrating any plain error in the district court's failure to give a specific unanimity instruction. Inofuentes has not identified any binding precedent requiring a specific unanimity instruction when multiple instances of commercial sex could satisfy a single charge.

19

3.      The district court properly denied Inofuentes's motion to suppress his statements to law enforcement in Miami.  Because there was no coercive police activity, explicit or implicit, and no promises of leniency, Inofuentes's statements were voluntary.  Regardless, given the overwhelming evidence of Inofuentes's guilt, any error in admitting his statements to law enforcement was harmless.

4.      The district court properly denied Inofuentes's motion to suppress the evidence recovered from the manual border inspection of his cell phone.  Binding precedent establishes that manual border searches of cell phones do not require any reasonable suspicion.  *See United States v. Belmonte Cardozo*, 181 F.4th 461 (4th Cir. 2026).

## Argument

### I. The district court did not abuse its discretion in admitting MV1's voice note at trial.

Inofuentes challenges the district court's admission at trial of a voice note MV1 sent him during their March 26-27, 2024, WhatsApp text exchange.  The voice note was offered to prove its effect on Inofuentes, not for its truth, and therefore was not hearsay.  Alternatively, the voice note was not hearsay because it was an adoptive admission.  But even if the district court abused its discretion in admitting the voice note, any error was harmless.

As an initial matter, Inofuentes incorrectly asserts that the Court reviews this issue de novo.  *See* Def. Br. 28.  It is well established that this Court reviews

20

evidentiary rulings that were preserved below for abuse of discretion. *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997). Consistent case law confirms that abuse of discretion review governs hearsay objections. *See, e.g.*, *United States v. Contreras*, 149 F.4th 349, 372 (4th Cir. 2025) (reviewing for abuse of discretion evidence admitted at trial pursuant to hearsay exception); *United States v. Elsheikh*, 103 F.4th 1006, 1025 (4th Cir. 2024) (same); *United States v. Cunningham*, 761 F. App'x 203, 206 (4th Cir. 2019) (same). Under that standard, this Court will only reverse a district court's ruling if it was "arbitrary or irrational." *United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir. 1988). Such rulings are also subject to harmless error review under Federal Rule of Criminal Procedure 52. *See United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995).

### A. The voice note was not hearsay because it was offered to show its effect on Inofuentes, not for its truth.

Hearsay is an out-of-court statement offered "*to prove the truth of the matter asserted in the statement.*" Fed. R. Evid. 801(c)(2) (emphasis added). If a statement is offered for any other reason, it is not hearsay and may not be excluded on that basis. *See* Fed. R. Evid. 802 (providing hearsay is generally not admissible but establishing no broad rule against out-of-court statements). Thus, "whether a statement is hearsay depends on the purpose for which it is offered." *United States v. Ferguson*, 140 F.4th 538, 545 (4th Cir. 2025).

21

Not everything a person says or writes is hearsay, *United States v. Gallagher*, 90 F.4th 182 (4th Cir. 2024); indeed, "[n]ontruth purposes abound," *Ferguson*, 140 F.4th at 545. A classic example is a statement offered for its effect on the listener. *See, e.g.*, *United States v. Simmons*, 11 F.4th 239, 263–64 (4th Cir. 2021) (upholding admission of recorded telephone call between rival gang members about their "beef" with defendant because evidence was admitted not "to prove as true the reasons for the 'beef' as stated on the call, but to prove how those reasons caused [the defendant] to react"); *United States v. Coley*, 447 F. App'x 501, 503 (4th Cir. 2011) (unpublished) (affirming admission of informant's statements on recordings because they "were not admitted to prove the truth of the matters asserted," but "to put [the defendant's] admissions on the tapes into context, making the admissions intelligible for the jury") (quoting *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006)); *United States v. Jenkins*, 579 F.2d 840, 842 (4th Cir. 1978) ("Insofar as elements of the taped conversations not directly expressing Johnson's intent were offered to prove that intent, they were not hearsay, for the import of them was their effect on her and not their truth.").

"Such statements are not hearsay because their relevance does not depend on whether the declarant spoke the truth." *Gallagher*, 90 F.4th at 195. "Instead, they are admissible because they are offered to 'establish the state of mind thereby induced' in the recipient or 'to show the information which [the recipient] had as

22

bearing on the reasonableness [or] good faith . . . of subsequent conduct.'" *Id.* (citing 2 McCormick on Evid. § 249 (8th ed.) (McCormick)).

Here, MV1's voice note, which she sent during her exchange of WhatsApp messages with Inofuentes, provided context both for Inofuentes's ongoing attempts to negotiate a price for sex with MV1, and the effect it had on Inofuentes during that negotiation. JA1851; *see also* JA1949–1964. Before MV1 sent the voice note, Inofuentes told MV1 he was "in San Diego" "Talking to people" "But I want you[.]" JA1702-1703. He then said, "Work with me" "I have money." JA1704. MV1 asked if Inofuentes was waiting for her, or if he was "going to go with the other one." JA1702-1703. At trial, Inofuentes admitted that when MV1 asked if he was "waiting for [her]" or if he was "going to go with the other one" she was referring to another prostitute. JA2177-2178. Inofuentes also admitted he and MV1 used the term "work" as a euphemism for commercial sex work or prostitution. JA2155.

During the course of their WhatsApp conversation on March 26, 2024, Inofuentes and MV1 went back and forth on the amount he would pay her for sex. Inofuentes said he would pay her the "Regular" price, and they could go to "a nice place[.]" JA1705. He then offered MV1 "100,000-200,000" and asked her, "Is my money no good?" JA1707. Inofuentes reiterated, "There's a hotel" "here in San Diego" and asked MV1, "Don't you want to work?" JA1708. MV1 asked Inofuentes a second time how much he would pay her. JA1709. Inofuentes said

23

"For fucking" "Ask" "80,000 too little" and then he asked, "Do you charge me more than some other man?" "You shouldn't charge so little[.]" JA1709-1710. Inofuentes pressed MV1 to "Charge enough" and "Go for 80,000[.]" JA1711. MV1 then sent Inofuentes a voice note (JA1711), which was translated into English and offered at trial as government's exhibit 205-A (JA1850-1851):

> Michael, look, when we met you know that I did not charge you cheaply. Sorry about that. And if you're expecting that because she told you at 80 I will go with you, no, you are very mistaken in life. And now, now I'm off to San Diego. Don't talk to me when you see me, I don't want you to talk to me because I'm going to be working, don't look for me at all. You didn't want to go with me and my girlfriends, fine, no big deal. Fine, but I hope and expect that you won't be looking for me in San Diego. Thank you.

In response to the voice note, Inofuentes sent a crying emoji. JA1712, JA802. MV1 then repeated, "I don't charge 80." JA1712. Inofuentes told MV1, "You're worth more than gold" and asked her, "How much do you charge?" JA1712. He continued to entice MV1 into having commercial sex with him, telling her, "I always give you very good money for a while . . ." and "I was going to give you 200,000 for the time but 300,000 is fine." JA1713. After that, MV1 told Inofuentes they would "see each other in San Diego to go to a hotel." JA1713. Inofuentes replied, "Well yes" "Unless you prefer some other crazy depraved man from around San Diego." JA1713.

MV1's voice note, sent in the middle of this exchange, provided context for the ongoing negotiation over the price for sex and the effect it had on Inofuentes,

24

who, as a result of receiving it, increased his offer. *See, e.g.*, *United States v. Louis*, 233 F. Appx. 933, 935 (11th Cir. 2007) (affirming that statements offered to give context to defendant's statements were not offered for the truth and therefore did not fall within the ambit of the Confrontation Clause); *United States v. Bermea-Boone*, 563 F.3d 621, 626 (7th Cir. 2009) (affirming that it is "well-settled" that statements that are offered for context, and not for the truth of the matter asserted, are not hearsay). The government did not offer the voice note to prove, for example, that the first time MV1 and Inofuentes met she had not charged him cheaply, or that MV1 did not want Inofuentes to speak to her. *Cf. United States v. Guerrero-Damian*, 241 F. App'x 171, 173 (4th Cir. 2007) ("A statement is not hearsay if it is offered to prove knowledge, or show the effect on the listener or listener's state of mind."). Thus, the district court did not abuse its discretion in admitting the evidence.

### B. The voice note was not hearsay because it was an adoptive admission.

MV1's voice note was also admissible as Inofuentes's adoptive admission. "'[A] statement is not hearsay' if the statement is offered against a party and if the party against whom the statement is offered 'has manifested an adoption [of] or belief in' the truth of the statement." *United States v. Robinson*, 275 F.3d 371, 382–83 (4th Cir. 2001) (quoting Fed. R. Evid. 801(d)(2)(B)). "When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be

25

induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *Id*. (citing *United States v. Jinadu,* 98 F.3d 239, 244 (6th Cir.1996)). "A party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence." *Id*.

Here, MV1 told Inofuentes, "when we met you know that I did not charge you cheaply . . . And if you're expecting that because she told you at 80 I will go with you, no, you are very mistaken in life." JA1851. In response, Inofuentes sent MV1 a crying emoji and told her, "You're worth more than gold" "How much do you charge?" "I always give you very good morning for a while" and "I was going to give you 200,000 for the time but 300,000 is fine." JA1712-1713.

Inofuentes's written responses to the voice note indicate that he heard, understood, and acquiesced in the statement. *Robinson*, 275 F.3d at 383. Indeed, under these circumstances, an innocent individual accused of previously paying 80,000 Colombian pesos ($20 USD) to a minor sex worker would normally be induced to respond to the accusation. *See id.* Here, however, not only did Inofuentes not deny the accusation, but he increased his money offer as a result of it.

Although the district judge did not state the basis for overruling Inofuentes's hearsay objection, *see* JA20, "[e]vidence rulings may be affirmed if they are correct—whether the district court explains why or not." *Ferguson*, 140 F.4th at

26

546. "[I]f the district court [] gives no reasons for admitting the evidence, then [this Court] will affirm that unreasoned ruling so long as the record and the law support the evidence's admission." *Id*. Because MV1's voice was note was not hearsay, the district court correctly admitted the evidence. Thus, the ruling should be affirmed.

### C. In any case, any error in admitting the voice note was harmless.

Even if this Court disagrees, any error in admitting MV1's voice note was harmless. "Evidentiary rulings are subject to harmless error review under Federal Rule of Criminal Procedure 52, such that in order to find a district court's error harmless, [this Court] need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010). "The overall strength of the government's evidence constitutes an important factor in this inquiry." *United States v. Recio*, 884 F.3d 230, 238 (4th Cir. 2018).

It is clear from the entirety of the record below that any error in admitting the voice note was harmless. At trial, Inofuentes admitted that he knew MV1 was a minor, that she was engaged in sex work, and that they had a sexual relationship, beginning the first night they met. JA2144-2148, JA2153-2154. He disputed only that he ever paid MV1 in exchange for sex. JA2093. But in his interview with law enforcement at Dulles, excerpts of which were played at trial, Inofuentes admitted

27

that he solicited MV1 for commercial sex at a hotel during their March 26-27, 2024, WhatsApp conversation. *See e.g.*, JA2390 ("At this point in time I'm offering her money to go and have sex with her at a hotel"); JA2390 ("The thing is I've been giving her money, ok. At this time, I'm not in, I don't have, I was thinking about meeting up with her . . ."); JA2390 ("It is, it would be for like, sex . . ."); JA2390 ("I was considering meeting up with her. And these are the messages that we were going to meet up. And go to a hotel. And give her money.").

At trial, Inofuentes also admitted that he knew MV1 was engaged in sex work on the night of March 26, 2024, and that in this conversation he was soliciting her to meet him for sex. JA2126-2129. He said he told MV1 "work with me" because "it's the language she's using" and "the plans that she has." JA2126-2127. He told her they could go to a nice place because "maybe she would be interested in that" and "maybe that would be something that could get her to come with me." JA2127. Inofuentes offered MV1 a place with a sauna to "paint[] a picture of a place that's nice" "[b]ecause perhaps that would get her attention." JA2128. Inofuentes said he offered MV1 different sums of money "to see if she will bite onto one of those numbers." JA2129. "She wants money, and I am offering money." JA2129. When he asked MV1 if she wanted to work, Inofuentes "wanted her to respond to [him]" "that's what she was looking for, that's what she was up to." JA2131.

28

Inofuentes contends that the admission of the voice note was not harmless because the government referenced the note four times during its closing argument. Def. Br. 31.  But "these references were minor in relation to the overwhelming" testimonial and digital evidence. *See United States v. Naughton*, 621 F. App'x 170, 176 (4th Cir. 2015).  Specifically, the government read the voice note in full once, JA2221, and twice quoted MV1's statement that "[W]hen we first met, I did not charge you cheaply," *see* JA2225, JA2231.  Finally, in rebuttal, the government responded to Inofuentes's argument that MV1's statement meant "that she didn't charge him at all," arguing, "that doesn't make sense."  JA2248.  Accordingly, "the judgment was not swayed" by any error in admitting the voice note.  *See United States v. Williams*, 41 F.3d 192, 200 (4th Cir. 1994) (holding that, although hearsay "statement was improperly admitted, and the government did briefly mention" it "in its closing argument," the error was harmless "in light of the overwhelming evidence of guilt" and "the minor nature of the error").

Inofuentes also argues the voice note was harmful because the jury sent a note about that exhibit during deliberations. Def. Br. 31.  Specifically, the jury wrote, "Can't figure out date of voice conversation.  Would be helpful to know."  JA2286.  With the parties' agreement, the district court responded, "Your recollection of the evidence controls."  JA2286–2287.  The record hardly suggests that the voice note "played a determinative role in the verdict."  *See United States v. Brown*, 765

29

F. App'x 902, 908 (4th Cir. 2019) (per curiam) (holding that any error in admitting evidence of prior conviction was harmless where the government's other evidence "was convincing and overwhelming").

In sum, there was substantial evidence admitted at trial proving Inofuentes's guilt beyond a reasonable doubt. Any error in admitting this voice note was harmless and did not affect the judgment.

## II. The district court properly instructed the jury.

Next, Inofuentes asserts that the district court reversibly erred by failing to give the jury a specific unanimity instruction as to the date on which he committed the charged offenses. Because Inofuentes identified a potential duplicity challenge on the eve of trial and then failed to request a specific unanimity instruction, he waived this claim, and it is not reviewable on appeal. Alternatively, even if Inofuentes merely forfeited his claim, he has not satisfied the stringent requirements of plain-error review.

### A. Inofuentes waived the argument that the jury had to be unanimous as to the date of each offense.

Inofuentes waived the argument he now raises that the district court should have instructed the jury that they must unanimously find Inofuentes committed each charged offense on at least one specific occasion during the date range charged in the superseding indictment. Def. Br. 32-39. To be sure, "[c]ourts may review a forfeited claim for plain error." *United States v. Robinson*, 744 F.3d 293, 298 (4th

30

Cir. 2014). But this case "is one of waiver, not forfeiture." *Id.* "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted).

This Court has recognized that "[a] party who identifies an issue, and then explicitly withdraws it, has waived the issue." *Robinson*, 744 F.3d at 298 (quoting *United States v. Rodriguez*, 311 F.3d 435, 437 (1st Cir. 2002)). "And 'when a claim is waived, it is not reviewable on appeal, even for plain error.'" *United States v. Ivey*, 60 F.4th 99, 115–16 (4th Cir. 2023) (quoting *Robinson*, 744 F.3d at 298). "Rather, a valid waiver means that there was 'no error at all.'" *Robinson*, 744 F.3d at 298 (quoting *United States v. Keeter*, 130 F.3d 297, 300 (7th Cir. 1997)).

Inofuentes never moved to dismiss the indictment as duplicitous. *See* Fed. R. Crim. P. 12(b)(3)(B). On September 8, 2025, the day before trial was scheduled to begin, Inofuentes claimed for the first time that there was a "major problem with the duplicity in the indictment, and it's going to have to be cured through jury instructions." JA668. He then argued that "there should be an instruction to the jury that they have to be unanimous as to the specific date that he allegedly committed this offense." JA669. Observing that "[w]e have known that this has been a date range" "since day one," the district court instructed Inofuentes's counsel, "If you have something to file, you file it. Okay?" JA671. He never did.

31

Inofuentes suggests that he preserved this argument by objecting to the government's proposed instruction 26 ("On or About-Explained"), which explained the meaning of "on or about" in the superseding indictment. JA650; *see* Def. Br. 32. Specifically, Inofuentes objected to including the word "between," arguing that including the word "between," "permits—or even encourages—the jury to consider actions and mental states of Inofuentes across a ten-month period and return a guilty verdict without unanimously deciding, as required, that the actions and mental state concurred at the same time on some date reasonably near the date alleged by the government." JA657-658. But Inofuentes never proposed that instruction 26, nor any other instruction, must advise the jury that it had to be unanimous as to the date on which he committed each charged offense.

Furthermore, during the instructions conference, the district court observed, "I think it goes to what you have on your verdict form, which is like specifying we know that the parties or the jurors must be unanimous, you want it to be shown on the verdict form in some way, and here you're asking for there to be one specific date. Is that what you are—" JA816-817. Defense counsel then interjected and assured the district court, "Yeah 'on or about' is fine. *We're not saying they have to allege a specific date*. It's the 'between on or about' that we have an issue with." JA817 (emphasis added). The district court overruled the objection, reasoning that the language in the instruction tracked the language of the superseding indictment.

32

JA818.

Nor did the special verdict form Inofuentes proposed, which the district court adopted with minor modifications, require unanimity as to a single occasion within the specified date range. *See* SA69-70; JA2195 (proposing to "use the defendant's verdict form"). Moreover, Inofuentes expressly *agreed* to the final verdict form. *See* JA2196.

Thus, by identifying the date range issue and then failing to request a specific unanimity instruction, disclaiming any argument that "they have to allege a specific date," JA817, and failing to request a finding as to a specific date on the special verdict form, Inofuentes waived the argument he makes now. *See United States v. Hale*, 857 F.3d 158, 170 (4th Cir. 2017) (holding that defendant "waived any objection to the form of the willful blindness instruction" by stating "affirmatively to the court that he ha[d] *no problem* with the form of the proposed instruction"); *see also Wood v. Milyard*, 566 U.S. 463, 474 (2012) (holding that the State waived any timeliness defense where "the State was well aware of the statute of limitations defense available to it" but "twice informed the District Court" that it would not challenge the timeliness of the habeas petition); *Robinson*, 744 F.3d at 298 (holding that defendant waived his objection to the drug quantity calculation in the PSR when "he made the conscious choice at sentencing to proceed on the basis of the information contained in the PSR" and "adhered to this position when the district

33

court gave him an opportunity to change his mind"). Because Inofuentes waived any argument that the district court had to provide a unanimity instruction to the jury, this claim is "not reviewable on appeal." *Ivey*, 60 F.4th at 298.

### B. Alternatively, the district court did not plainly err in instructing the jury on Counts 1 and 2.

Even if the Court determines that Inofuentes did not waive his claim of instructional error, his claim is forfeited, and plain-error review applies. "A party who objects to any portion of the instructions . . . must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). Thus, "[a] party wishing to preserve an exception to a jury instruction must stat[e] distinctly the matter to which he objects and the grounds of his objection." *United States v. Naum*, 134 F.4th 234, 241 (4th Cir. 2025) (quoting *United States v. Nicolau*, 180 F.3d 565, 569 (4th Cir. 1999)). "The district court must be adequately apprised of the disputed matter and the need to take corrective action to avoid a new trial." *Id.*

Although Inofuentes objected to the use of the word "between" in the instruction defining the phrase "on or about" in the superseding indictment, JA657-658, he failed to inform the district court that the instructions and verdict form were improper because they did not require unanimity as to a single occasion within the specified date range. Indeed, his counsel told the district court, "We're not saying they have to allege a specific date." JA817. Because Inofuentes never proposed a

34

specific unanimity instruction, he failed to preserve this challenge. *See, e.g.*, *United States v. Camara*, 908 F.3d 41, 48 (4th Cir. 2018) (reviewing the defendant's venue challenge only for plain error where the defendant "lodged only a general objection to the court's supplemental instruction" and "failed to object specifically on venue grounds").

"To establish plain error," Inofuentes "must show that an error (1) was made, (2) is plain . . . , and (3) affects substantial rights." *United States v. Miller*, 41 F.4th 302, 310 (4th Cir. 2022) (quoting *United States v. Lynn*, 592 F.3d 572, 577 (4th Cir. 2010)). If Inofuentes "makes this three-part showing," this Court "may exercise its discretion to correct the error only if it seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *Id.* at 311 (quoting *Lynn*, 592 F.3d at 577). Inofuentes "has the burden of establishing each of the four requirements for plain-error relief," and doing so "is difficult." *Greer v. United States*, 593 U.S. 503, 508 (2021) (internal quotation marks omitted). Because Inofuentes cannot satisfy any of these requirements, the Court should affirm.

### 1. The district court did not err.

The district court did not err by failing to give a specific unanimity instruction. An error occurs "[i]f a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule.'" *Miller*, 41 F.4th at 310–11 (quoting *Olano*, 507 U.S. at 733–34). There is no legal rule requiring a specific unanimity

35

instruction for Section 1591 or 2423 offenses charged within a nine-month date range.  In fact, "in this Circuit, a defendant is entitled to a specific unanimity instruction only if there are 'special circumstances.'" *United States v. Roach*, 28 F.3d 1212 (4th Cir. 1994) (unpublished) (citing *United States v. Torcasio,* 959 F.2d 503, 508 (4th Cir. 1992), *abrogated on other grounds by Evans v. United States*, 504 U.S. 255 (1992)). "'Special circumstances' relate to whether there is a real possibility of juror confusion." *Id.*; *see also United States v. Payseno,* 782 F.2d 832, 836 (9th Cir. 1986) (specific unanimity instruction warranted when there is a "genuine possibility" the jury could have been confused).

No such special circumstances or the possibility of jury confusion existed here.  The evidence at trial established that Inofuentes repeatedly solicited MV1 and paid her for sex over the course of several months in 2024.  Thus, "[t]he multiple acts alleged [were] based on an ongoing set of dealings between two individuals" and "[t]here was little, if any, chance of jury confusion." *See Torcasio*, 959 F.2d at 508 (holding that district court did not plainly err in failing to require specific unanimity as to at least one of three discrete payments in extortion scheme).  Indeed, there was "no communication or other indication from the jury suggesting that it was in any way confused." *See United States v. Anguiano*, 873 F.2d 1314, 1318, 1319 (9th Cir. 1989) (holding that district court did not plainly err in failing to require specific unanimity as to "the dates of the conspiracy in which they found the

36

defendant participated").

Furthermore, the jury instructions provided correctly stated the essential elements of each offense. JA2265, JA2268. The district court instructed that "[e]ach juror must agree with each of the other jurors . . . that the same means or methods alleged in each count of the superseding indictment was in fact engaged in or employed by the defendant in committing the crime charged." JA2261. The court also instructed the jury that its "verdict" "must be unanimous." JA2272. And the verdict form, to which Inofuentes agreed, required unanimity as to whether the government had proved a completed or attempted offense for each count. *See* JA2311–2312. On this record, the instructions "were not plainly erroneous." *See Roach* 28 F.3d at 1212 (affirming verdict where, "[a]t the beginning and end of the instructions the court informed the jury that its verdict must be unanimous" and "[d]uring its explication of the elements of the crime, the court stated in detail the required findings, telling the jury that it must find each of the elements met for at least one of the weapons to find guilt").

### 2. Any error is not plain.

Any error in the jury instructions or verdict form is not plain. A plain error must be "'clear' or 'obvious.'" *Miller*, 41 F.4th at 311 (quoting *Olano*, 507 U.S. at 734). "An error is plain if the settled law of the Supreme Court or this circuit establishes that an error has occurred." *United States v. Carthorne*, 726 F.3d 503,

37

516 (4th Cir. 2013) (internal quotation marks omitted).

Inofuentes has not identified any binding precedent requiring a specific unanimity instruction when the government alleges a date range in its indictment. Nor has Inofuentes identified any "decisions by other circuit courts of appeals" that support his position. *See United States v. Maxwell*, 285 F.3d 336, 342 (4th Cir. 2002). Instead, Inofuentes relies on two state cases: *Miller v. State*, 16 P.3d 937 (Idaho Ct. App. 2000), and *Commonwealth v. Conefrey*, 650 N.E.2d 1268 (Mass. 1995). Def. Br. 35-36. But "the level of specificity required for a valid verdict" depends on the statute. *See United States v. Allen*, 603 F.3d 1202, 1214 (10th Cir. 2010). *Miller* and *Conefrey* analyzed Idaho and Massachusetts state statutes, respectively, and did not interpret § 1591 or § 2423. Thus, any error in the district court's instructions or verdict form is not plain.

### 3. Any plain error did not affect Inofuentes's substantial rights.

Any plain error in the instructions or verdict form did not affect Inofuentes's substantial rights. "A plain error normally affects a defendant's substantial rights if the error was prejudicial, meaning that it 'affected the outcome of the district court proceedings.'" *United States v. Hardy*, 999 F.3d 250, 254 (4th Cir. 2021) (quoting *Olano*, 507 U.S. at 734). To satisfy the "substantial rights" prong, Inofuentes "has the burden of showing that," if the district court had given a specific unanimity instruction, "there is a reasonable probability that he would have been acquitted."

38

*See Greer*, 593 U.S. at 508 (internal quotation marks omitted). Inofuentes has not made that showing here.

As discussed above, at trial the government presented substantial evidence that Inofuentes engaged, and attempted to engage, in commercial sex with MV1 on at least three specific occasions within the date range specified in the superseding indictment, including on March 3-4, March 26-27, and April 1, 2024. The testimony as to each occasion was corroborated by the WhatsApp chats, payments to MV1, obscene photos of MV1 saved in Inofuentes's cell phone, and his admissions to law enforcement. Given the strength of that evidence, even if the court had instructed the jury to unanimously agree on a particular instance of commercial sex, there is no reasonable probability the jury would have acquitted. *See, e.g.*, *United States v. Farris*, No. 23-7009, 2023 WL 8752903, at *4 (10th Cir. Dec. 19, 2023) (order and judgment) (holding that, "if the jury had been instructed to agree unanimously on a particular instance of sexual assault within the date range of each count, there is no reasonable probability that the result of the trial would have been different"); *Allen*, 603 F.3d at 1216 (any error in failing to give a specific unanimity instruction was harmless).

### 4. The Court should decline to notice any plain error.

Finally, even if Inofuentes could demonstrate that any plain error affected his substantial rights, the Court should "decline to notice it here." *United States v. Reid*,

39

523 F.3d 310, 316 (4th Cir. 2008). "Plain error review exists to correct only the most grievous of unnoticed errors." *United States v. Robinson*, 627 F.3d 941, 956 (4th Cir. 2010). The Court's "discretion to notice plain error is appropriately exercised only when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Reid*, 523 F.3d at 316 (internal quotation marks omitted); *United States v. Jeffers,* 570 F.3d 557, 570 (4th Cir. 2009) (looking primarily to actual guilt under *Olano's* fourth prong). "[V]iewing the record as a whole, the proceedings" in this case "resulted in a fair and reliable determination" of defendant's guilt. *United States v. Cedelle*, 89 F.3d 181, 186 (4th Cir. 1996).

As detailed *supra*, substantial evidence showed that on at least three separate occasions Inofuentes solicited MV1 for commercial sex in Colombia. He admitted, on multiple occasions, that he knew MV1 was a minor and she engaged in sex work. He also admitted that on March 26, 2024, he solicited MV1 to meet him at a hotel for sex in exchange for money. His WhatsApp messages with MV1 corroborate his confession, as do the obscene images of MV1 saved in his phone. His cell phone also contained records of payments to MV1, including on March 4, 2024, just after he asked MV1 to sleep with him before he left Colombia. Indeed, even Inofuentes does not contest the sufficiency of the evidence supporting his convictions.

40

Accordingly, the Court should decline to correct any error in the instructions or the verdict form.

### III.    The district court properly denied Inofuentes's motion to suppress his statements to agents at Miami International Airport.

Inofuentes challenges the denial of his motion to suppress the statements he made to law enforcement in Miami, maintaining that his statements were involuntary.  This Court "review[s] the district court's 'legal conclusion as to the voluntariness of an accused's statements *de novo*, but its findings of fact on the circumstances surrounding the [statements] for clear error.'" *Elsheikh*, 103 F.4th at 1021-22 (quoting *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008)).  Because the district court properly determined that Inofuentes's statements were voluntary, it did not err in denying his motion to suppress.  Alternatively, any error in admitting the statements at trial was harmless.

### A. Inofuentes's statements to law enforcement were voluntary.

"The test for determining whether a statement is voluntary under the Due Process Clause 'is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence.'" *United States v. Purks*, 139 F.4th 388, 396-97 (4th Cir. 2025) (quoting *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc)).  The Court "examine[s] the totality of circumstances to determine whether a confession had been made freely, voluntarily and without compulsion or

41

inducement of any sort." *Id.* at 397 (quoting *Withrow v. Williams*, 507 U.S. 680, 689 (1993)). "Coercive police activity is a necessary finding for a confession or a *Miranda* waiver to be considered involuntary." *United States v. Giddins*, 858 F.3d 870, 881 (4th Cir. 2017). But "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination is critically impaired." *Id.* at 881 (internal quotation marks omitted). The existence of "[c]oercion is determined from the perspective of the suspect." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). Where law enforcement complies with *Miranda*, the "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled'" are "rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

Inofuentes assumes "[f]or purposes of this appeal" that he "validly waived his *Miranda* rights." Def. Br. 40 n.26. Inofuentes also submits that "there are no facts in dispute." Def. Br. 39-40. In this case, the totality of the circumstances make clear that Inofuentes's will and capacity for self-determination remained intact throughout his interview.

The record shows that Inofuentes was 44 years old at the time of his interview and speaks both English and Spanish. JA640, JA274. He was born in New York

42

and raised in Washington, D.C.  JA275.  Further, Inofuentes "is educated," having "attended the New England Conservatory and the Florida International University." JA640.  He had "two professions," working as "a professional musician" and "a student advisor." JA640.  He was previously married and is a father.  JA0276.  In sum, "there is nothing in the record—such as youth, diminished mental capacity, or intoxication—to suggest that [Inofuentes] was especially susceptible to police coercion." *See Braxton*, 112 F.3d at 785.

Furthermore, the setting and details of the interview supported the district court's finding of voluntariness.  The interview occurred "in an interview room with two agents" and lasted "about three hours." JA637.  The agents were in plain clothes and never displayed their weapons.  JA437-438.  Inofuentes was not handcuffed or physically restrained in any way.  JA436.  The "tone of the interview" "began as very informal and relaxed."  JA643.  Although "at certain points the questioning became more pointed," JA643, it was not hostile and remained cordial throughout, JA2393.  In fact, "after the interview had specifically turned to the issue of child exploitation," Inofuentes said, "'I could say I plead the Fifth,' but then he continue[d] on answering more questions." JA644.

Thus, the district court found, Inofuentes "is someone who fully understood his rights, his ability to waive them, and the fact that he could still invoke it, but he decided not to." JA644.  And, at the conclusion of the interview, Inofuentes left the

43

airport and returned to Virginia.  JA766, JA872-873.  The setting of the interview reinforces that Inofuentes's statements were voluntary.  *See, e.g.*, *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987) (reasoning, where "[t]he interviews were conducted by unarmed agents in a public hotel" and the defendant was allowed "to leave unaccompanied for a brunch date," that "[t]he setting of the interview support[ed]" the "holding that the statements were voluntary").

Inofuentes nonetheless argues that his statements were involuntary because the agents made him false promises, deceiving Inofuentes, and thereby overcoming his will and undermining his capacity for self-determination.  Def. Br. 42.  But Inofuentes has not provided a single example of any assurance, let alone "repeated assurances," that "if he told the truth about his sexual conduct with Individual-1, [he] would not get in trouble."  *See* Def. Br. 42.  Indeed, after listening to "the recording" and "reading the transcript" of the interview, the district court found no "trickery . . . whatsoever."  JA638; *see also* JA639 ("[T]here's no trickery there.  It's the direct opposite of it.").

Inofuentes points to instances during the interview when the agents either told him to tell the truth or couched their questions in terms of "box checking."  However, a closer examination of the interview reveals that the agents did not compel Inofuentes to speak, but rather warned him that if he lied to them (as he appeared to be doing), he would be committing a crime.  It is well established that

44

"[a]dmonishing a suspect to tell the truth during an investigatory interview . . . does not constitute coercive police conduct rendering a statement involuntary." *See Braxton*, 112 F.3d at 782; *see also Rivers v. United States*, 400 F.2d 935, 943 (5th Cir. 1968) (showing suspect 18 U.S.C. § 1001 during interrogation "merely emphasized that if Appellant was going to say anything, he had best tell the truth," and did not render "statement involuntary"). Accordingly, this Court held that an officer admonishing a suspect to "come clean" did not render the suspect's subsequent statements involuntary. *See Braxton*, 112 F.3d at 782-85. Other courts of appeals have similarly held that accusing a suspect of lying to elicit further statements is not improperly coercive. *See Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001); *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987) ("The fact that [law enforcement] accused Wolf of lying does not automatically render the questioning coercive, as an interrogator can legitimately express his disbelief at a defendant's story in order to elicit further comments or explanations.").

Here, the agents warned Inofuentes of the need to be truthful only after it became apparent that he was lying about his relationship with MV1. For instance, Inofuentes said, "I don't have sex with her," but then said he probably had "sexual photos." JA296. Accordingly, Ballard reminded him to be honest, because "obviously like I said, we can see it, we can read it, we have to ask you about it." JA296. Inofuentes went on to question the meaning of the term "sexual relations,"

45

asking, "what is this word?" JA297. Again, Ballard reminded him to be honest because "it's actually illegal to lie to us." JA297. Inofuentes continued to make contradictory statements, like admitting he had a sexual relationship with MV1, then claiming that they only "kiss[ed]" and "hugg[ed]." JA298. Inofuentes continued on this path until the agents stopped him and said, "Please be honest. I'm sorry. I just don't want you to get yourself in trouble" "Just say it." "Please be honest." "You just have to say it. Plain English." JA299. The agents' warnings were not attempts to compel Inofuentes to speak or to provide an assurance of leniency; they were attempts to stop Inofuentes from committing the further crime of lying to federal law enforcement agents.

Nonetheless, Inofuentes continued to lie, suggesting that all he did was "hug" MV1, while acknowledging what they did in bed together was "sexual." JA299-300. After this exchange, Inofuentes asked, "We're in trouble now, right?" JA300. Ballard responded, "No, it's just – I'm reading this and it's just not, like, aligning. Do you know what I mean? With what you're saying." JA300. Because Inofuentes repeatedly lied throughout the interview, Ballard repeatedly—truthfully—warned him that *lying* could get him in trouble. There is nothing about Ballard's response here or anywhere else in the interview that could be described as a promise of leniency if only Inofuentes would answer the questions. *See Braxton*, 112 F.3d at 783 ("A law enforcement officer's admonishment to a suspect during an

46

investigatory interview to tell the truth or face consequences is simply not an implied promise of non-prosecution.").

However, even if this statement could be construed as a promise of leniency, that fact alone does not render the ensuing statements involuntary. *See id.* ("The existence of a threat or an implied promise does not automatically render a confession involuntary."). "The proper inquiry is whether the confession was 'extracted' *by* the threats or implied promises, 'however slight.'" *Id.* (citing *Hutto v. Ross*, 429 U.S. 28, 30 (1976)). Viewing the totality of the circumstances here, Ballard's statement did not "overpower[]" Inofuentes's "will" or present him with "an implied promise that he could not refuse." *See id.* In addition to Inofuentes's age, education, and experience, and the setting of the interview, his lies throughout the interview demonstrated that his will and self-determination remained intact. *See, e.g.*, *Minnesoia v. Murphy*, 465 U.S. 420, 438 (1984) ("[T]he fact that Murphy apparently felt no compunction about adamantly denying the false imprisonment charge on which he had been convicted before admitting to the rape and murder strongly suggests that the 'threat' of revocation did not overwhelm his resistance.").

Inofuentes's claim that he was "physically and emotionally exhausted" during the interview, *see* Def. Br. 43, does not render his statements involuntary, either. Indeed, "suppression is not required every time a defendant has a diminished mental state." *United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012). Instead, there

47

must "be evidence that the police took advantage of" Inofuentes's state. *See id.* Here, there is no evidence that the agents exploited Inofuentes's "exhaustion" in any way. Instead, the district court noted, "when it seem[ed]" that Inofuentes was "moving too quickly through the[] statements of what his rights are" in reviewing the *Miranda* warnings, "the agents slow[ed] him down, and they ask[ed] him to read each line and initial if he understands." JA638. Thus, the agents "made sure that he understood" his rights when "he was attempting to blow past them." JA639.

Additionally, Inofuentes's contention that his statements were involuntary because he "had no meaningful prior experience with the criminal justice system" lacks merit. *See* Def. Br. 43. As a factual matter, Inofuentes minimizes his actual criminal history. In 2013, he was arrested in Fairfax County on a charge of domestic assault and battery. JA2315. According to the police report, Fairfax County police were dispatched to Inofuentes's home in response to a domestic violence call. JA2316. At the scene, the police interviewed Inofuentes, who admitted to pushing the victim and covering her mouth with his hand and a pillow. JA2316. Based on that investigation, Inofuentes was arrested and charged with domestic assault and battery. JA2316-2317. Inofuentes pleaded guilty to the charge, which was ultimately dismissed based on his completion of a domestic violence class and active probation. JA2319. As a result, the district court recognized, "this is someone who would have had his rights read to him at least once before." JA640.

48

Although Inofuentes did not have a "lengthy criminal history," his prior experience with law enforcement made it unlikely that "anything here . . . would prevent him from understanding his rights and then waiving them." JA640; *see, e.g.*, *Correll v. Thompson*, 63 F.3d 1279 (4th Cir. 1995) (holding, where the defendant was 24 years old and had numerous prior experiences with law enforcement and *Miranda* warnings, that his waiver of his right to counsel was voluntary); *United States v. Robinson,* 404 F.3d 850, 861 (4th Cir. 2005) (reasoning that the defendant "was 'street smart' and understood his *Miranda* rights").

In sum, given Inofuentes's background and experience, as well as the setting and details of the interview, his statements were voluntary. Moreover, there is no evidence of coercive police activity. Thus, the district court properly denied his motion to suppress.

## B. Alternatively, any error in admitting Inofuentes's statements was harmless.

Finally, even if the district court erred in denying the motion to suppress Inofuentes's statements in Miami, any error was harmless beyond a reasonable doubt. *See, e.g.*, *United States v. Blauvelt*, 638 F.3d 281, 290 (4th Cir. 2011); *see also Arizona v. Fulminante*, 499 U.S. 279, 296-302 (1991).

While Inofuentes's statements in Miami provided *some* evidence probative of his relationship with MV1, the government introduced substantial other evidence of his commercial sex trafficking of MV1. At most, Inofuentes's statements were

49

cumulative of other direct and circumstantial evidence establishing his guilt, including the hundreds of pages of WhatsApp messages between Inofuentes and MV1, payments to MV1, obscene pictures of MV1 saved on Inofuentes's phone, and Inofuentes's admission to law enforcement at Dulles that on March 26, 2024, he offered MV1 money to meet him at a hotel for sex. Given the "overwhelming evidence" that Inofuentes solicited and paid MV1 for sex, "it is clear . . . beyond a reasonable doubt that the jury would have reached the same guilty verdict even without" Inofuentes's statements. *See Blauvelt*, 638 F.3d at 290 (concluding that any error was harmless given "[t]he minimal significance of [the defendant's] inculpatory statements . . . in the context of the overwhelming evidence of his illegal activity"); *see also Elsheikh*, 103 F.4th at 1014 (holding any error in admission of defendant's allegedly false responses regarding his identity was harmless, where challenged testimony involved less than ten pages of trial transcript out of thousands, evidence was freestanding, and evidence was cumulative of other direct and circumstantial evidence establishing defendant's guilt, including extensive testimonial and documentary evidence).

## IV.  The district court properly denied Inofuentes's motion to suppress the manual border inspection of his cell phone.

Finally, Inofuentes maintains that the district court should have suppressed the fruits of the manual border search of his cell phone because law enforcement lacked reasonable suspicion that his phone contained contraband or evidence of

50

transnational crime.  This Court's precedent in *United States v. Belmonte Cardozo*, 181 F.4th 461 (4th Cir. 2026), forecloses this claim.

In *Belmonte Cardozo*, this Court held that "manual searches of cell phones at the border are routine and thus do not require individualized suspicion." *Id.* at 464. "In a forensic search, an officer connects the device to outside hardware or software, copies its contents and analyzes the copy." *Id*. at 471.  A forensic examination of a phone is "nonroutine" and requires "some measure of individualized suspicion." *United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018).  By contrast, "[i]n a manual search, an officer opens the device, scrolls through it and reads what any user would see." *Belmonte Cardozo*, 181 F.4th at 471.  "Considering the differences in forensic and manual searches and balancing the government's interest in preventing contraband from entering the country at the border with individuals' privacy expectations in the data in their cell phones," the Court held that "manual cell phone searches are routine border searches that do not require individualized suspicion." *Id.*

"In reaching this conclusion," the Court noted that "every one of [its] sister circuits to have considered the issue has reached the same result." *Id.*; *see United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024); *United States v. Castillo*, 70 F.4th 894, 898 (5th Cir. 2023); *Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021); *United States v. Cano*, 934 F.3d 1002, 1014 (9th Cir. 2019); *United States v. Touset*,

51

890 F.3d 1227, 1233–35 (11th Cir. 2018); *see also United States v. Xiang*, 67 F.4th 895, 899–900 (8th Cir. 2023).

In light of *Belmonte Cardozo*, the manual border search of Inofuentes's cell phone required no reasonable suspicion. *See Belmonte Cardozo*, 181 F.4th at 472. The Court is bound by that precedent. *See McMellon, McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc) ("[O]ne panel cannot overrule a decision issued by another panel."). And to the extent that Inofuentes raises a new theory, the Court is still bound by *Belmonte Cardozo*. *See Gibbons v. Gibbs*, 99 F.4th 211, 215 (4th Cir. 2024) ("Few—if any—judicial opinions reflect on and reject every conceivable counterargument, and 'the rule that one panel cannot overrule' another would be weak tea indeed if all a later panel had to do was identify a fact, theory, or argument a previous panel did not address.") (quoting *McMellon*, 387 F.3d at 356)). Therefore, the district court properly declined to suppress the fruits of the border search of Inofuentes's cell phone.

52

## Conclusion

The Court should affirm the judgment of the district court.

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

Theophani K. Stamos
First Assistant United States Attorney

_____ /s/

Lauren Halper
Assistant United States Attorney

53

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 365.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,745 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, signature block, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/

Lauren Halper
Assistant United States Attorney